**UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

| | |
|---|---|
| Andrea R. Lucas, EEOC Chair,<br><br>Charging Party,<br><br>v.<br><br>Harvard University et al.,<br><br>Respondents. | EEOC Charge No. 830-2025-00004<br><br>Subpoena No. HU-A26-02 |

**PETITION TO REVOKE OR, ALTERNATIVELY, MODIFY SUBPOENA NO. HU-A26-02**

**EXHIBIT 3**

**TABLE OF CONTENTS**

**Page**


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 3

A. Harvard's Highly Rigorous Faculty Hiring Processes are Decentralized and Multilayered ..... 4

B. The EEOC's Commissioner Charge ..... 5

C. The EEOC's First Set of Requests for Information ..... 7

D. The EEOC's Second Set of Requests for Information and the EEOC's Subsequent Investigation Proposal ..... 8

E. The EEOC's Third Set of Requests for Information ..... 13

F. The EEOC's Subpoena ..... 15

III. LEGAL STANDARD FOR ISSUANCE OF AN ADMINISTRATIVE SUBPOENA ..... 16

IV. SUBPOENA NO. HU-A26-02 SHOULD BE REVOKED ..... 18

A. The Subpoena Should Be Revoked Because It Was Prematurely Issued in Violation of the EEOC's Own Compliance Manual. ..... 18

B. The Subpoena Should Be Revoked Because the Underlying Charge Upon Which It is Based Is Invalid. ..... 20

1. The Charge is Invalid Because it is Facially Untimely. ..... 21

2. The Charge Is Vague and Overbroad and Offers an Incoherent Theory of Discrimination. ..... 22

3. The Charge's Presumption of Liability Based on Demographic Data Violates Executive Order 14281. ..... 24

C. The Subpoena Should Be Revoked Because It Is Independently Invalid. ..... 26

1. The Subpoena Constitutes an Impermissible Fishing Expedition. ..... 26

2. The Subpoena Is Overbroad and Imposes an Undue Burden. ..... 28

3. The Subpoena Is Impermissibly Vague, and Harvard Cannot Reasonably Respond Without Further Meeting and Conferring with the EEOC to Narrow Its Scope. ..... 34

4. The Burden Imposed by the Subpoena Outweighs the Minimal Relevance of Information Sought. ..... 36

5. The Subpoena Was Improperly Served on Harvard. ..... 36

D. The Subpoena Should Be Revoked Because It Was Served Improperly in Retaliation for Harvard's Protected First Amendment Activity. ..... 37

V. CONCLUSION ..... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alinoski v. Musculoskeletal Transplant Found., Inc.*,
679 F. App'x 224 (3d Cir. 2017) ....................23

*Bush v. Commonwealth Edison Co.*,
990 F.2d 928 (7th Cir. 1993)....................23

*Celestine v. Petroleos De Venezuela SA*,
108 F. App'x. 180 (5th Cir. 2004) ....................21

*Collier v. Austin Peay State Univ.*,
616 F. Supp. 2d 760 (M.D. Tenn. 2009)....................30

*EEOC v. Asplundh Tree Expert Co.*,
340 F.3d 1256 (11th Cir. 2003) ....................19

*EEOC v. Associated Dry Goods Corp.*,
449 U.S. 590 (1981)....................19

*EEOC v. Austal USA, LLC*,
2017 WL 4563078 (S.D. Ala. Aug. 18, 2017)....................27

*EEOC v. Bellemar Parts Indus., Inc.*,
865 F.2d 780 (6th Cir. 1989)....................21

*EEOC v. Dean Witter Co.*,
643 F.2d 1334 (9th Cir. 1980) ....................16

*EEOC v. FAPS, Inc.*,
No. 10-3095 JAP DEA, 2014 WL 4798802 (D.N.J. Sept. 26, 2014)....................22

*EEOC v. Ford Motor Credit Co.*,
26 F.3d 44 (6th Cir. 1994)....................17, 27, 36

*EEOC v. Forge Indus. Staffing Inc.*,
2014 WL 6673574 (S.D. Ind. Nov. 24, 2014) .................... 27, 33

*EEOC v. Joe's Stone Crabs, Inc.*,
296 F.3d 1265 (11th Cir. 2002) ....................22

*EEOC v. K-Mart Corp.*,
694 F.2d 1055 (6th Cir. 1982) ....................16, 21, 26

*EEOC v. Kronos Inc.*,
620 F.3d 287 (3d Cir. 2010) ........ 16

*EEOC v. Morgan Stanley & Co.*,
132 F. Supp. 2d 146 (S.D.N.Y. 2000) ........ 29, 33, 34

*EEOC v. Ocean City Police Dep't*,
820 F.2d 1378 (4th Cir. 1987), *cert. granted, judgment vacated on other grounds*, 486 U.S. 1019 (1988) ........ 21, 22

*EEOC v. Packard Elec. Div., Gen. Motors Corp.*,
569 F.2d 315 (5th Cir. 1978) ........ 17, 28

*EEOC v. Roadway Exp., Inc.*,
682 F. Supp. 26 (D. Md. 1988) ........ 21

*EEOC v. Royal Caribbean Cruises, Ltd.*,
771 F.3d 757 (11th Cir. 2014) ........ 17, 28, 33

*EEOC v. Schwan's Home Serv.*,
644 F.3d 742 (8th Cir. 2011) ........ 16

*EEOC v. Shell Oil Co.*,
466 U.S. 54 (1984) ........ 16, 17, 24

*EEOC v. United Air Lines, Inc.*,
287 F.3d 643 (7th Cir. 2002) ........ *passim*

*English v. Colorado Dep't of Corr.*,
248 F.3d 1002 (10th Cir. 2001) ........ 23

*Fed. Exp. Corp. v. Holowecki*,
552 U.S. 389 (2008) ........ 19

*In re Grand Jury Subpoena: Subpoena Duces Tecum*,
829 F.2d 1291 (4th Cir. 1987) ........ 34

*Jahour v. Massachusetts Bay Transportation Auth.*,
2024 WL 519562 (D. Mass. Feb. 9, 2024) ........ 21

*Kobrin v. Univ. of Minnesota*,
34 F.3d 698 (8th Cir. 1994) ........ 27

*LeBlanc v. Great Am. Ins. Co.*,
6 F.3d 836 (1st Cir. 1993) ........ 24

*Morawski v. Farmers Tex. Cnty. Mut. Ins. Co.*,
No. 3:14-mc-21-D-BN, 2014 WL 717170 (N.D. Tex. Feb. 25, 2014) ........ 37

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) .......... 21

*Perkins Coie LLP v. U.S. Dep't of Justice*,
No. CV 25-716 (BAH), 2025 WL 1276857 (D.D.C. May 2, 2025) .......... 40

*President & Fellows of Harvard Coll. v. DHS*,
788 F. Supp. 3d 182 (D. Mass. 2025) .......... 38

*President & Fellows of Harvard Coll. v. DHS*,
No. 1:25-CV-11472, 2025 WL 1479077 (D. Mass. May 23, 2025) .......... 38

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*,
798 F. Supp. 3d 77 (D. Mass. 2025) .......... 5, 38, 39

*Ray v. Ropes & Gray LLP*,
799 F.3d 99 (1st Cir. 2015) .......... 24

*Sanchez v. Brown Univ.*,
711 F. Supp. 3d 53 (D.R.I. 2024) .......... 30

*Simpson v. Kay Jewelers, Div. of Sterling, Inc.*,
142 F.3d 639 (3d Cir. 1998) .......... 23

*Texas v. EEOC*,
933 F.3d 433 (5th Cir. 2019) .......... 19

*Thomas v. Eastman Kodak Co.*,
183 F.3d 38 (1st Cir. 1999) .......... 21

*United States v. Powell*,
379 U.S. 48 (1964) .......... 40

*United States v. Tivian Labs., Inc.*,
589 F.2d 49 (1st Cir. 1978) .......... 40

*Watson v. Fort Worth Bank & Tr.*,
487 U.S. 977 (1988) .......... 24

**Statutes**

5 U.S.C. § 552, *et seq.* .......... 1

18 U.S.C. § 1905 .......... 1

42 U.S.C. § 2000e-8(a) .......... 16

## I. INTRODUCTION

Pursuant to 29 C.F.R. § 1601.16(b), the President and Fellows of Harvard College ("Respondent" or "Harvard") petitions to revoke or, alternatively, modify the subpoena duces tecum (Subpoena No. HU-A26-02) (the "Subpoena") served by Deputy District Director Jeremy Crosbie on June 11, 2026.[1] The Subpoena is attached hereto as Exhibit A.

The EEOC filed a Commissioner Charge No. 830-2025-00004 ("Charge") against Harvard on April 25, 2025, claiming that Harvard has violated Title VII since at least 2018. The EEOC subsequently sent Harvard three sets of requests for information ("RFIs") with 723 separate requests, including subparts. Harvard timely responded in good faith to the RFIs, including substantive correspondence with the EEOC 23 times, the production of more than 9,000 pages of responsive information, and express invitations to the EEOC to meet and confer as to every RFI, providing 68 days of availability (totaling hundreds of hours of availability) since January 26, 2026, alone. The EEOC last conferred with Harvard on December 15, 2025. Despite Harvard's repeated offers, the EEOC has not responded and, instead, issued the Subpoena.

The EEOC breached its own Compliance Manual by issuing the Subpoena before exhausting meet-and-confer efforts on their RFIs. *See* EEOC Compliance Manual (Vol. 1) § 24.1. Earlier this year, the EEOC said it would "narrow" its inquiry to select schools and to particular categories of employees that those schools hired or promoted. That narrowing followed the EEOC's tacit admission that the underlying Charge was too overbroad and ill-defined to serve as a guide for its

[1] Harvard provides this information, which it considers to be confidential, with the understanding that the Commission will maintain it in confidence, use it exclusively in its investigation of the Charge, and not disclose it to anyone outside the Commission without Harvard's express written consent pursuant to the requirements of the Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, and other statutes including, without limitation, 18 U.S.C. § 1905. This disclosure of information, including any Exhibits, to the Commission is for purposes of its investigatory proceedings and is not, and should not be considered, a waiver of attorney-client privilege or work-product privilege, which Harvard maintains.

investigation. The EEOC has now suddenly moved the goalposts back to its original unwieldy scope without warning or explanation. The Subpoena demands that within just 14 days, Harvard produce documents and information regarding *all* 13 schools at Harvard and *all* applicants for faculty positions—which is many thousands of people—over the span of an eight-year period.[2] Harvard cannot reasonably respond without further meeting and conferring with the EEOC regarding this scope.

In addition to violating the EEOC's Compliance Manual, the Subpoena should be revoked because the Charge upon which it is based is invalid for three reasons. *First*, the Charge is time-barred because it is premised on conduct that falls entirely outside Title VII's statute of limitations period, and the EEOC cannot pursue an investigation of time-barred claims. *Second*, the Charge is invalid due to its overbreadth and lack of specificity. *Third*, the Charge's presumption of liability based on demographic data violates Executive Order 14281, which eliminates disparate impact liability.

The requests in the Subpoena are also invalid and should be revoked for five reasons. *First*, the Subpoena constitutes a virtually boundless and impermissible fishing expedition. *Second*, the Subpoena is overbroad and unduly burdensome because gathering the information the EEOC seeks would require many thousands of hours of labor, and would substantially impair Harvard's operations. Personnel decisions and related recordkeeping at Harvard are highly decentralized across its 13 schools and hundreds of academic departments and are not catalogued in an easy-to-access applicant management system, as may be the case at other types of employers. Tenure-related decisions at some schools, for example, may involve more than 100 individuals. *Third*, the Subpoena is impermissibly vague. *Fourth*, the cost and burden imposed by the Subpoena outweigh the minimal relevance of

[2] Harvard notes that on June 15, 2026, the EEOC escalated even further by serving a second subpoena (Subpoena No. HU-A26-03) consisting entirely of information that the EEOC has never sought through RFIs.

information sought, particularly given the lack of any specific aggrieved individual, the vague and indefinite nature of the Charge, and the time-barred status of the "relevant time period" defined in the Subpoena. *Fifth*, the Subpoena also should be revoked for the independent reason that it was improperly served on Harvard.

Finally, the Subpoena should be revoked both because it and the Charge it purportedly investigates are unconstitutional retaliation in response to Harvard's legally protected speech and litigation activity. The flaws in the Subpoena—of which there are many—and the timing of EEOC's actions demonstrate that it is not engaged in a good-faith investigation but rather is part of the whole-of-Government retaliation against Harvard that started in April 2025 and continues unabated to this day. The Government's relentless campaign has included, to date, revoking federal funding, expelling Harvard's foreign students, threatening Harvard's tax-exempt status, opening multiple agency investigations into Harvard's finances and statutory and regulatory compliance, and twice suing Harvard. It also includes the EEOC's Charge and this Subpoena. The Charge was launched at the same time the Government began its unconstitutional campaign of retaliation, and the Subpoena is timed with yet another ratcheting up of pressure against Harvard in an attempt to get it to cave to the Administration's ideological demands.

For the foregoing reasons, Harvard requests that the EEOC revoke the Subpoena and resume the dialogue over the appropriate scope of the RFIs in accordance with its own Compliance Manual.[3]

## II. BACKGROUND

Harvard is a research university located in Cambridge, Massachusetts, dedicated to advancing knowledge and educating students across the spectrum of arts, sciences, law, and medicine. Harvard employs over 22,000 faculty members and professional, support, research, and service staff in the

[3] Attached hereto as Appendix A are specific objections to each Subpoena Request, incorporating the arguments below.

University's central administration, the undergraduate college, 12 graduate and professional schools, and the Harvard Radcliffe Institute.

Harvard is an equal opportunity employer. It selects and promotes staff and faculty without regard to legally protected categories, including race, color, sex, national origin, and sexual orientation.

### A. Harvard's Highly Rigorous Faculty Hiring Processes are Decentralized and Multilayered

Faculty hiring decisions at Harvard include multiple levels of review by numerous individuals—both within a school and at the University level—that vary widely across schools and drastically differ from the more simplified hiring processes of non-academic employers. By design, input on a particular candidate is sought from as many people as possible. Dozens, if not hundreds, of people are involved in a single hiring decision, and may provide input on every decision at various levels of review.

The tenure-track and tenured faculty hiring process at Harvard's T.H. Chan School of Public Health ("HSPH"), just one of Harvard's 13 schools, is illustrative. For both tenure-track and tenured positions, HSPH uses search committees—typically comprising four or five members of the faculty—to undertake an initial search and review of applicants' submissions. These search committees then create a short list of candidates for a campus visit, which includes a recorded seminar and interview with the search committee, department chairs, other members of the faculty, and the Dean for Academic Affairs. All who view the seminar or meet with the candidate are invited to submit evaluations.

At this point, the process for tenure-track and tenured positions diverge. For tenure-track positions, search committees will issue recommendations to all primary faculty within either HSPH or the relevant department. All senior faculty within the relevant department will then vote on the committee's recommendation. Candidates will then be reviewed by a separate standing committee for final approval.

For tenured positions, search committees will solicit external evaluations from academics in the candidate's field. Upon review, the search committees will report their conclusions up through the HSPH Dean of Academic Affairs, the department chair, and then eventually a standing committee that votes on whether to progress to the next step of the process. If the candidate progresses, HSPH will assemble an ad-hoc committee to evaluate and consult witnesses regarding the candidate. Such ad-hoc committees typically include, but are not limited to, several faculty members (both in and outside of HSPH) as well as individuals from outside of the university.

These processes are representative of similar (but distinct) processes at each of Harvard's 13 schools. For instance, some schools administer hiring differently for ladder faculty hires (*i.e.*, tenured or tenure-track) and non-ladder positions, where hiring for ladder faculty positions are managed at the school level and non-ladder positions are managed at the department level with no centralized administration.

Unpacking and reproducing the decisional information regarding the consideration of each applicant and each faculty member is inherently a manual process that can only be done at a candidate-by-candidate level.

### B. The EEOC's Commissioner Charge

On April 21, 2025, Harvard filed a Complaint against the federal government in the District of Massachusetts alleging that the Government froze nearly $2.2 billion in funding in retaliation for Harvard's refusal to capitulate to the Government's content and viewpoint-based demands ("funding suit"). *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77 (D. Mass. 2025). The Government quickly expanded its retaliation against Harvard.

Four days later, on April 25, 2025, Commissioner Andrea R. Lucas filed the Commissioner Charge against Harvard. The Charge claims that, since at least 2018, Harvard (including any related or affiliated entities) violated Title VII by engaging in "a pattern or practice of disparate treatment

against white, Asian, male, or straight employees, applicants, and training program participants in hiring, promotion (including but not limited to tenure decisions), compensation, and separation decisions; internship programs; and mentoring, leadership development, and other career development programs." Exhibit B (Charge) at 1-2.

The Charge does not limit the categories of employees purportedly at issue and states that the alleged unlawful conduct includes, but is not limited to, discrimination against faculty as well as alleged "student employees and training program participants" with respect to 16 select "programs," four of which are not controlled by Harvard whatsoever. *See id.* at 1-5. The Charge defines a broad, disjointed, and internally contradictory group of aggrieved individuals that encompasses nearly all the current, former, and prospective employees at Harvard and nearly all current, former, and prospective applicants for employment at Harvard:

> The aggrieved individuals include all employees, former employees, prospective employees, and current and prospective training program applicants and participants who are white, Asian, male, non-black, non-Native American, or straight and who have been, continue to be, or may be in the future adversely affected by the unlawful employment practices complained of herein.

*See id.* at 5-6.

On May 27, 2025, Harvard timely submitted a detailed Position Statement in response to the Charge, after the EEOC refused to provide even a brief courtesy extension of the initial response deadline. In addition to emphasizing Harvard's non-discrimination policy and commitment to compliance with Title VII and other applicable laws against discrimination, the Position Statement identified multiple facial deficiencies in the Charge. The Position Statement established that (1) the Charge constitutes unlawful retaliation in response to Harvard's legally protected speech and litigation activity; (2) the Charge's theory of discrimination contravenes the Commission's operative enforcement guidance; (3) the Charge's theory of discrimination contravenes the President's Executive Order barring agency civil rights enforcement based on disparate impact; (4) the Charge does not

assert any timely claims of discrimination; (5) the Charge does not allege a violation of Title VII; (6) the Charge asserts a legally and logically incoherent theory of discrimination; (7) the Charge is not "valid" under controlling precedent due to both its breadth and lack of specificity; and (8) the Charge implicates decisions for which the Commission has no jurisdiction and for which Harvard does not have legal responsibility. *See* Exhibit C (Position Statement) at 3-4.

On June 20, 2025, Harvard supplemented its initial Position Statement, providing additional details explaining (1) why the Charge must be dismissed as a prohibited disparate impact claim under Executive Order No. 14281 and related guidance from the EEOC; (2) the Charge's failure to allege facts sufficient to support a pattern-or-practice claim; and (3) that the 16 "student programs" do not violate Title VII and several are not controlled by Harvard. *See generally* Exhibit D (Supplemental Position Statement).

### C. The EEOC's First Set of Requests for Information

On August 1, 2025, the EEOC served on Harvard (A) a "Step 1" RFI seeking detailed information about Harvard's electronic recordkeeping, data storage, and tracking systems, various exemplar personnel records, and the use, if any, of automated processes or artificial intelligence in employment processes; and (B) an itemized list of 33 additional RFIs with 84 subparts seeking a combination of documents and narrative responses. *See* Exhibit E (August 1, 2025 RFIs), Exhibit F (August 1, 2025 Step 1 RFIs) (collectively "the First Set RFIs").

The First Set RFIs were not targeted at any discrete employment action but were instead broad and vague, apparently aimed at scouring for any shred of evidence that might support the assertions in the Charge. Many were boundless in scope, seeking, for example, documents "sufficient to identify all hiring and promotion decisions" in which "race, sex, or sexual orientation were taken into account," covering an (at the time) seven-year period (First Set RFI Nos. 6-8); *all* "documents that relate to, reflect, refer to, describe or evidence" a *non-exhaustive* list of 16 programs without any subject matter

or temporal limitation (First Set RFI No. 11); and "all materials, including but not limited to emails or other electronic messages, during the relevant time period, containing any statement tending to show that Harvard considered race, sex, and/or sexual orientation in hiring or promotion decisions, or for selection for a fellowship, internship, career development, mentorship and/or leadership program" (First Set RFI No. 17).

On September 8, 2025, Harvard timely served its written responses and objections to the First Set RFIs, together with 3,491 pages of responsive information and 67 separate Excel files in native format. Exhibit G ("Response to August 1, 2025 RFIs"); Exhibit H ("Response to August 1, 2025 Step 1 RFIs"). Although Harvard objected to each of the 33 requests, it offered to meet and confer with the EEOC in good faith to better understand and seek to reach an agreement on the appropriate scope of the RFIs. Exhibit G at 2; Exhibit H at 2.

### D. The EEOC's Second Set of Requests for Information and the EEOC's Subsequent Investigation Proposal

The very next day, on September 9, 2025, the EEOC served a second set of 97 new RFIs (with 248 subparts) primarily related to the 16 student programs identified in the Charge. Exhibit I (the "Second Set RFIs").

On September 17, 2025, Stephen Damiani, Lead Systemic Investigator for the Houston District and New Orleans Field Office, emailed counsel for Harvard "accept[ing]" Harvard's offers to meet and confer. Exhibit J (September 17, 2025 Email).

On September 29, 2025, the Parties met and conferred regarding Harvard's objections and responses to the First Set RFIs. *See* Exhibit K (December 15, 2025 Letter) at 2. In the two-hour discussion, the Parties were only able to discuss First Set RFI Nos. 1-16, leaving First Set RFI Nos. 17-33 for further discussion. During the meet and confer, counsel for Harvard explained the unprecedented nature of the EEOC's investigation as to the breadth of positions covered and the indefinite categories of discrimination at issue. Harvard explained that the allegations in the Charge

called for the EEOC to investigate every single employment decision at Harvard for a (then) seven-year period.

The EEOC did not respond to these issues during the meet and confer, but instead agreed to come back to Harvard with clarification on the following topics: (A) any additional information on the categories of employees the EEOC are investigating (*i.e.*, staff v. faculty); (B) the legal and factual basis for the January 1, 2018 to present, time frame; (C) specific types of discrimination under investigation (*i.e.*, whether the EEOC are looking at protected characteristics beyond discrimination against white, Asian, male, and straight employees); (D) additional context for the allegation that Harvard had a goal of "demographic diversification of the faculty"; and (E) any narrowing of the scope of RFIs referencing all hiring and promotion decisions. *Id.* at 2. To date, the EEOC has not explained either the January 1, 2018, to present time frame or the types of discrimination it is investigating.

On October 2, 2025, Harvard emailed Investigator Damiani to provide additional availability to meet and confer. In light of the government shutdown, which began at midnight on October 1, 2025, Harvard offered its availability for the remainder of October, including several hours of availability on each business day between October 3, 2025, and October 31, 2025. Exhibit L (October 2, 2025 Email).

On October 14, 2025, Harvard submitted its written objections and responses to the Second Set RFIs. Exhibit M (Responses to Second Set RFIs). Although Harvard agreed to produce responsive documents and/or provide responsive information, it asked the EEOC to meet and confer regarding those RFIs if the EEOC believed Harvard's responses were deficient in any respect. *See generally id.* Harvard also provided several hours of availability to meet and confer during each business day over the remainder of October 2025. *Id.* at 2. On December 4, 2025, Investigator Damiani emailed Harvard to arrange a second meet and confer, and, in this email, included a question regarding

the storage of applicant information. Exhibit N (December 4, 2025, Emailed RFI).

Harvard responded on December 5, 2025, agreeing to meet and confer for four hours on December 15, 2025, while also requesting the status of the questions the EEOC promised to answer regarding the Charge and the investigation. Exhibit O (December 5, 2025 Email). In response, on December 9, 2025, Deputy Director Crosbie acknowledged the "delay in responding to [Harvard's] questions regarding the meaning and scope of the RFIs and the Charge." Exhibit P (December 9, 2025 Email). Deputy Director Crosbie explained that his office was "still coordinating with HQ leadership on these items." *See id.*

On December 15, 2025, Harvard responded to the December 4, 2025, Emailed RFI. *See* Exhibit K (December 15, 2025 Letter). In addition to objecting to the form and content of the December 4, 2025, Emailed RFI, Harvard noted the following:

> [T]he location and retention of resumes, CVs, applications, and notes, as well as the format in which such items are maintained, depends on the position at issue, as well as the college or department in which the position sits. Answering further, such documents are not centrally stored for all Harvard employees, faculty, or student-employees.

*Id.* at 5.

At the outset of the December 15, 2025, meet and confer, the EEOC proposed a narrowing of the Charge (hereafter, the "Investigation Proposal"). The EEOC explained that the information sought by RFIs, as well as any future RFIs, concern the following terms and conditions of employment, employee population, and time period:

- **Terms or Conditions of Employment**: all hiring, promotion, compensation, and career development decisions.
- **Employee Population:** all faculty (including tenured, non-tenured, ladder, and visiting), all student employees with paid administrative or operational duties, and all exempt employees Grade 55-64.
- **Time Period:** January 1, 2018, to the present.

Exhibit Q (January 9, 2026, Response to NIP). The EEOC offered the following proposal for the next set of RFIs:

- Of all of the schools, departments, and programs operational at Harvard and its affiliates since January 1, 2018, the EEOC will issue a new set of RFIs directed at a certain number of schools, departments, and/or programs.

- The EEOC asked Harvard to identify the number of schools, departments, and programs that it believes will be reasonable for this next set of RFIs.

- If the EEOC agrees that Harvard has offered a reasonable number of schools, departments, and programs, then the EEOC will issue RFIs for that number of schools, departments, and/or programs.

- If the EEOC believes that additional schools, departments, and programs are warranted, it will increase the number of schools, departments, and programs subject to the next set of RFIs.

*Id.* at 2.

The EEOC did not explain its view of what constitutes a single school, department, or program. However, during the December 15, 2025, meet-and-confer, Investigator Damiani stated that Harvard Medical School may count as one school, department, or program, even though it contains multiple departments as well as several distinct programs expressly identified in the Charge. Investigator Damiani suggested that the EEOC hoped Harvard would agree that six to 10 schools, departments, and/or programs is a reasonable number for the next set of RFIs. *Id.* at 2.

On January 9, 2026, Harvard submitted its initial response to the Investigation Proposal, agreeing to it in principle but proposing that the EEOC focus its next set of RFIs on any six "organizational units" of the EEOC's choosing from any of the following schools: Faculty of Arts and Sciences ("FAS"), Harvard Law School ("HLS"), or Harvard Medical School ("HMS"). *Id.* at 4. Harvard explained that each of its various schools and its central administration contain numerous departments, administrative offices, initiatives, centers, or divisions, each of which include associated employees. Harvard described these as "organizational units." Harvard explained that FAS had

approximately 5,000 employees at the end of 2025, that HMS had approximately 3,000 such employees, and that HLS had approximately 850 such employees. *Id.* at 5.

Harvard further explained that the EEOC's proposal to "narrow" its investigation would make little sense if it included entire schools at Harvard. *Id.* Six to 10 schools, for example, would constitute approximately 50 to 83 percent of all of Harvard's schools. *Id.*

On January 16, 2026, and January 23, 2026, Harvard submitted letters clarifying the number and identity of organizational units at FAS, HLS, and HMS to assist the EEOC in identifying the appropriate number of organizational units for the Investigation Proposal. Exhibit R (January 16, 2026, Supplemental Response to NIP) at 4; Exhibit S (January 23, 2026, Second Supplemental Response to NIP) at 4. Both letters offered several hours of availability on each business day between January 26 and February 6, 2026, to meet and confer with the EEOC. Exhibit R at 2; Exhibit S at 2.

Rather than meet and confer, on February 12, 2026, the EEOC submitted to Harvard the specifics of its investigation proposal, or what it described as "a provisional, narrowed scope of the investigation of the above-referenced Charge." Exhibit T (the "New Investigation Proposal") at 1. The New Investigation Proposal "narrowed" the EEOC's investigation to discrimination with respect to "[f]aculty, including tenure-track/tenured, non–tenure track, clinical, research, adjunct/part-time, visiting, instructional faculty, and PhD student faculty," occurring at five schools: FAS, HLS, HSPH, Harvard Business School ("HBS"), and Harvard Divinity School ("HDS"), occurring from January 1, 2018 to the present. *Id.* The EEOC further noted that the New Investigation Proposal would include onsite interviews in Boston. *Id.* at 1-2; Exhibit U (On-Site Interview Requests) at 1.

The EEOC explained that it would soon issue what it described as "a provisional, narrowed RFI" in line with this narrowed scope of the investigation. Exhibit T at 2. The New Investigation Proposal did not preview any forthcoming RFI, the topics it would cover, or the number of individual requests to be included. *Id.*

### E. The EEOC's Third Set of Requests for Information

On March 6, 2026, the EEOC served its Third Set RFIs, consisting of 64 separate RFIs (with 185 subparts), and asked Harvard to respond by March 20, 2026, just two weeks later. Exhibit V (Third Set RFIs). On that same day, Investigator Damiani emailed counsel for Harvard, asking that Harvard "please acknowledge receipt of this correspondence and confirm Harvard's agreement to this narrowed, provisional approach" by March 11, 2026. Exhibit W (March 6, 2026 Email). Investigator Damiani's email also requested that Harvard submit supplemental responses to the Step 1 RFIs. *Id.*

On March 11, 2026, Harvard agreed to cooperate regarding the New Investigation Proposal, while reserving all rights and without waiver of any objections Harvard may have, including objections to any Third Set RFI or any forthcoming RFIs related to the New Investigation Proposal. Exhibit X (March 11, 2026 Response to NIP) at 1. Harvard noted, however, that its agreement to cooperate was not an agreement that the proposal was reasonable, fair, or "[n]arrowed," as suggested by the EEOC. *Id.* at 2. Harvard explained that the New Investigation Proposal is inconsistent with the investigation proposal conveyed by Investigator Damiani on the Parties' December 15, 2025, meet-and-confer conference:

- The New Investigation Proposal has not narrowed the investigation to the department or program level—instead, it comprises five of Harvard's schools in their entirety;
- Three of the schools in the New Investigation Proposal are not even mentioned in the Charge (including HLS, HBS, and HDS); and
- Two of the schools in the New Investigation Proposal have not been the subject of any prior RFI from the EEOC (HBS and HDS).

*Id.* Harvard further noted that the New Investigation Proposal ignored each of Harvard's objections and arguments raised in its correspondence to the EEOC between January 9 and January 23, 2026, without any attempt by the EEOC to meet and confer. *Id.* at 2-3.

On March 20, 2026, Harvard submitted its objections and written responses to the Third Set RFIs. Exhibit Y (Responses to Third Set RFIs); Exhibit Z (Supplemental Responses to Step 1 RFIs). In addition, Harvard noted that many of the Third Set RFIs were beyond the scope of the New Investigation Proposal because they sought information related to Harvard generally, related to schools beyond the five schools identified in the New Investigation Proposal, and related to student-employees as opposed to faculty. *See generally* Exhibit Y.

Still, Harvard agreed to provide the documents and information requested, subject to its objections. Harvard noted that the EEOC's requests were expansive and asked Harvard to provide information from multiple schools that could only be collected manually, a process that would "be labor-intensive and burdensome, and will require substantial time for [Harvard] to complete." *Id.* at 7. Harvard explained that beginning on April 3, 2026, it would provide further supplemental responses identifying responsive documents and information. *Id.* at 1.

As with Harvard's other written responses to the EEOC, Harvard offered its availability to meet and confer, including several hours of availability on each business day between March 23 and April 3, 2026. *Id.* at 3. The EEOC did not respond to Harvard's initial responses to the Third Set RFIs, or its offer to meet and confer.

Beginning on April 3, 2026, and continuing through June 12, 2026, Harvard provided the following additional materials to the EEOC:

- April 3, 2026 - Harvard's First Supplemental Responses to the Third Set RFIs;
- April 14, 2026 - Harvard's Third Production;
- April 17, 2026 - Harvard's Second Supplemental Responses to the Third Set RFIs;
- May 1, 2026 - Harvard's Third Supplemental Responses to the Third Set RFIs and Harvard's Fourth Document Production;
- May 8, 2026 - Harvard's Fifth Document Production;
- May 15, 2026 - Harvard's Fourth Supplemental Responses to the Third Set RFIs;
- May 22, 2026 - Harvard's Sixth Document Production;
- May 29, 2026 - Harvard's Fifth Supplemental Responses to the Third Set RFIs;
- June 5, 2026 - Harvard's Seventh Document Production; and

- June 12, 2026 - Harvard's Sixth Supplemental Responses to the Third Set RFIs.

*See* Exhibits AA–AJ. Over this period, Harvard produced an additional 6,000 pages; provided six written supplemental responses (including further written responses to the Third Set RFIs); and offered on a biweekly basis its availability to meet and confer, with specific dates and times for nearly every business day for the period from January 26, 2026, to June 12, 2026—264.5 hours of availability across 68 business days.

Between March 20, 2026, and June 11, 2026, the EEOC (1) never asked to meet and confer; (2) never informed Harvard of any deficiencies in its responses; (3) never asked Harvard to prioritize any specific RFIs in the Third Set RFIs; and (4) never inquired as to whether Harvard's production was complete as to any RFI. At no point in this period did the EEOC substantively respond to any of Harvard's responses or its ongoing document production.[4] As of the date of this Petition, Harvard continues to be met with silence from the EEOC.

### F. The EEOC's Subpoena

On June 8, 2026, the EEOC sent the Subpoena by certified mail directly to Harvard's General Counsel. Despite being aware that Harvard is represented by the undersigned, the EEOC did not serve the Subponea through the EEOC Respondent Portal, or by email from either Investigator Damiani, or Deputy Director Crosbie (with whom counsel for Harvard routinely communicated). Exhibit A. The EEOC uploaded the Subpoena to the Respondent Portal on June 12, 2026, without proof of service. The USPS tracking number for the Subpoena (#70160600000065681231) indicates it was received by Harvard on June 11, 2026.

[4] Indeed, the only correspondence from the EEOC during this time occurred on May 29, 2026, where Investigator Damiani requested that if Harvard had a production "not so large to upload to [the EEOC Respondent] portal, [to] please upload to [the EEOC Respondent] portal," rather than through an external share site. Exhibit AK (May 29, 2026 Email). Harvard notes that previous productions were too large to submit through the EEOC Respondent Portal and, as such, Harvard began producing documents through an external file share site. Exhibit AL (April 14, 2026 Email).

Without explanation or notice, the Subpoena radically departs from the EEOC's New Investigation Proposal, with which Harvard was fully cooperative, and significantly expands the investigation. Rather than limiting its requests to the five schools identified in the New Investigation Proposal, the Subpoena seeks information regarding all Harvard schools. Likewise, though the Third Set RFIs sought only information regarding faculty that were hired or promoted by the five schools identified, the Subpoena seeks information regarding all *applicants* for faculty positions at *any* school at Harvard, irrespective of whether they were hired. During the EEOC's investigation, it has not previously served any RFIs requesting Harvard to identify applicants for faculty positions.

Worse, the EEOC has provided a facially unreasonable 14-day deadline to meet these new expansive demands. Though Harvard has repeatedly explained to the EEOC that it does not have a central repository for all faculty applicant and hiring information, and that the collection of such data requires manual, labor-intensive means, the EEOC's deadline disregards this reality entirely (again without explanation or discussion).

## III. LEGAL STANDARD FOR ISSUANCE OF AN ADMINISTRATIVE SUBPOENA

The EEOC is entitled to inspect and copy "any evidence of any person being investigated or proceeded against that relates to unlawful employment practices . . . and is relevant to the charge under investigation." 42 U.S.C. § 2000e–8(a) (2012). But the EEOC's investigative authority is neither plenary nor unlimited; the EEOC is entitled to access only evidence that is relevant to the charge under investigation. *See EEOC v. Schwan's Home Serv.*, 644 F.3d 742, 746 (8th Cir. 2011); *EEOC v. Kronos Inc.*, 620 F.3d 287, 296 (3d Cir. 2010). An EEOC subpoena seeking irrelevant information is properly revoked. *EEOC v. Shell Oil Co.*, 466 U.S. 54, 64 (1984); *EEOC v. Dean Witter Co.*, 643 F.2d 1334, 1338 (9th Cir. 1980).

The relevance requirement is designed to prevent fishing expeditions by the Commission. *EEOC v. K-Mart Corp.*, 694 F.2d 1055, 1066 (6th Cir. 1982); *EEOC v. United Air Lines, Inc.*, 287 F.3d

643, 653 (7th Cir. 2002). To that end, the Supreme Court has cautioned that the charge and relevance requirements should *not* be interpreted so liberally as to render the statutory language authorizing them—which includes judicial review of EEOC data requests—a "nullity." *Shell Oil Co.*, 466 U.S at 69; *see also EEOC v. Ford Motor Credit Co.*, 26 F.3d 44, 47 (6th Cir. 1994) (rejecting is the EEOC's position that it is "entitled to any material which EEOC deems relevant in its discretion" because "[i]f Congress had meant for EEOC's determination of relevance simply to be accepted by the courts it would not have provided for judicial review of these data requests").

"As the Supreme Court has made clear, [a] court may not enforce an administrative subpoena unless the request seeks relevant material and is not unduly burdensome." *Ford Motor Credit Co.*, 26 F.3d at 47. A district court—which would ultimately decide any subpoena enforcement action by the EEOC—"may weigh such equitable criteria as reasonableness and oppressiveness in issuing [or enforcing] a subpoena for documents." *EEOC v. Packard Elec. Div., Gen. Motors Corp.*, 569 F.2d 315, 318 (5th Cir. 1978). In evaluating the reasonableness of the burden imposed by a subpoena relative to its relevance, courts have cautioned against the application of rigid rules such as requiring an employer to establish that compliance would interfere with its normal business operations. *See, e.g.*, *EEOC v. Royal Caribbean Cruises, Ltd.*, 771 F.3d 757, 763 (11th Cir. 2014). Rather, reviewing courts must "weigh such equitable criteria as reasonableness and oppressiveness," which "impl[ies] a balancing of hardships and benefits." *Packard Elec. Div., Gen. Motors Corp.*, 569 F.2d at 318. The use of the plural "hardships and benefits" "clearly indicates that a district court may consider a number of factors in this analysis, rather than requiring specific types of evidence on a single factor." *Royal Caribbean Cruises*, 771 F.3d at 763; *see also United Air Lines, Inc.*, 287 F.3d at 653 ("What is unduly burdensome depends on the particular facts of each case and no hard and fast rule can be applied to resolve the question").

## IV. SUBPOENA NO. HU-A26-02 SHOULD BE REVOKED

### A. The Subpoena Should Be Revoked Because It Was Prematurely Issued in Violation of the EEOC's Own Compliance Manual.

The EEOC's refusal to meet and confer regarding Harvard's responses and objections to the RFIs or its ongoing document productions prior to issuing the Subpoena represents a pronounced departure from the EEOC's longstanding guidelines and customs. The EEOC's Compliance Manual contemplates that employers will raise legitimate objections to RFIs and discourages investigators from issuing subpoenas without first exhausting meet-and-confer efforts or exploring alternative means for obtaining desired information:

> A respondent's initial reluctance to provide evidence can often be overcome by determining its reasons for refusal and attempting to resolve these concerns . . . . Inquire whether the data could be obtained in another format or from other sources. As the investigation develops, other evidence may eliminate the need for the requested information.

EEOC Compliance Manual (Vol. 1) § 24(a).

The Compliance Manual further makes clear that subpoenas are disfavored methods of discovery because of their expense. *Id.* ("Ordinarily, use subpoenas only after other investigative methods have been attempted . . . . Subpoenas are often more expensive than diligent pursuit of the evidence by other means."). The Compliance Manual directs investigators to only pursue a subpoena as a last resort:

> If the respondent persists in its refusal, the supervisor may make a second, more formal written request. However, upon a review with the legal unit, it may be agreed that a second request is unnecessary, as when the respondent has unequivocally refused to produce and is clearly aware of EEOC's authority. If a second request is sent, it should cite EEOC's investigative and subpoena authority (*see* § 24.2); describe the evidence sought and EEOC's efforts to date to obtain it; set a date for submission of the evidence; and explain that failure to comply will result in issuance of a subpoena. If all or most of the data is not provided within the prescribed timeframe, and conditions for exercise of the direct suit option do not apply (*see* § 24.4(e)), make a written subpoena request to the District Director.

*Id.* § 24(d).

The formal guidance prepared and affirmed by the EEOC is binding on the agency and its staff, and prevents enforcement contrary thereto. *See Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (referring to the Compliance Manual as "binding on EEOC staff"); *see also Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (same).

Title VII requires the EEOC to use caution and care when exercising its authority incident to the initiation of court proceedings, in part, because Congress was concerned with "prevent[ing] wide or unauthorized dissemination of unproved charges[.]" *EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 599 (1981) (noting that the EEOC's confidentiality obligations are relieved once it institutes a "proceeding") (citing 42 U.S.C. § 2000e–8(e); 29 C.F.R. § 1601.22). These obligations cannot be disregarded because of mere "administrative convenience." *See id.*; *see also EEOC v. Asplundh Tree Expert Co.,* 340 F.3d 1256, 1261 (11th Cir. 2003) (explaining the EEOC is supposed "to reserve judicial action as a last resort").

The EEOC failed to uphold these obligations in three distinct respects. *First,* by the standard articulated in the Compliance Manual, there is no basis for the Subpoena. Far from unequivocally refusing to produce records or information, Harvard has produced more than 9,000 pages and offered concrete times to meet and confer regarding the scope of the RFIs from late January to the present. *See* Exhibits R–S; Exhibits Y–AJ. The EEOC ignored this offer and did not notify Harvard that it took any issue with the state of Harvard's production or its timing, remaining silent since serving the Third Set RFIs on March 6, 2026.

Nor can the EEOC claim that meeting and conferring would be fruitless. Through the meet-and-confer process, the EEOC acknowledged that the investigation envisioned by the Charge was too broad and unwieldy and, as a result, engaged with Harvard to narrow the investigation. *See* Exhibit T. Since, Harvard has endeavored to maintain a consistent dialogue with the EEOC. *See* Exhibits X–AJ.

*Second*, the Subpoena conflicts with the Compliance Manual because the EEOC now seeks documents and information that were never sought from Harvard. Where the investigation was ultimately limited to faculty hiring and promotions at only five of Harvard's schools, the Subpoena now seeks such information regarding *all* schools at Harvard. The Subpoena also, for the first time, seeks documents and information regarding applicants for faculty positions, whereas all previous RFIs concerned only faculty that were actually hired or promoted by Harvard. *Compare* Third Set RFI Nos. 1-15 *with* Subpoena Request Nos. 7-9.

*Third*, there are no circumstances that would justify the EEOC abandoning the RFI process and issuing a subpoena. Harvard consistently provided documents and information nearly each week since March 20, 2026, without any response from the EEOC. If anything in its investigation warranted this escalation, surely the EEOC could have said so on any of the 68 days of availability Harvard provided to meet and confer. The failure to communicate any supposed need to escalate to the Subpoena indicates that no such need exists, and the EEOC has simply failed to adhere to its binding Compliance Manual.

The EEOC remains bound by its own procedures to meet and confer with Harvard and determine whether the information legitimately sought can be obtained through informal means. The Subpoena should therefore be revoked to enable the EEOC and Harvard to engage in an interactive dialogue to determine whether they can reach an accord on the appropriate scope of the investigation.

### B. The Subpoena Should Be Revoked Because the Underlying Charge Upon Which It is Based Is Invalid.

Because "the EEOC's investigative authority is tied to charges filed with the Commission," "a valid charge of discrimination 'is a jurisdictional prerequisite to judicial enforcement of a subpoena issued by the EEOC.'" *United Air Lines, Inc.*, 287 F.3d at 650 (quoting *Shell Oil Co.*, 466 U.S. at 64).

This threshold validity requirement applies to commissioner charges. *See, e g.*, *EEOC v. Bellemar Parts Indus., Inc.*, 865 F.2d 780, 781 (6th Cir. 1989); *K-Mart Corp.*, 694 F.2d at 1064.

Here, the Charge fails at this initial step for three reasons: (1) it is time-barred because it is premised on conduct outside the statute of limitations; (2) it is fatally vague and overbroad; and (3) it relies exclusively on neutral demographic data in contravention of Executive Order 14281.

**1. The Charge is Invalid Because it is Facially Untimely.**

The EEOC lacks jurisdiction to investigate any Charge premised on conduct outside Title VII's 300-day statute of limitations period—*i.e.*, conduct occurring before June 29, 2024. *See EEOC v. Ocean City Police Dep't*, 820 F.2d 1378, 1380 (4th Cir. 1987), *cert. granted, judgment vacated on other grounds*, 486 U.S. 1019 (1988) ("[A] charge which shows on its face that it is untimely is also an invalid charge incapable of invoking EEOC's investigatory powers."); *EEOC v. Roadway Exp., Inc.*, 682 F. Supp. 26, 29 (D. Md. 1988) ("Because the charge of discrimination . . . filed with the EEOC is untimely on its face, this Court cannot enforce the subpoena . . . . Accordingly, the EEOC's application for enforcement of that subpoena will be DENIED.")

Claims brought under Title VII are subject to a strict 300-day statute of limitations. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002); *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 47 (1st Cir. 1999) (noting 300-day rule applies in Massachusetts). Any Charge not filed within 300 days of the accrual of a discrimination claim is time barred.[5] *Id.* The strict limitations period in Title VII

[5] Because the Charge is based exclusively on discrimination, and does not allege harassment, there is no basis for applying the continuing violation doctrine to extend the statute of limitations period beyond June 29, 2024. Alleged discrete discriminatory acts, such as hiring, promotions, separations, and compensation decisions are not subject to the continuing violation doctrine. *See Jahour v. Massachusetts Bay Transportation Auth.*, 2024 WL 519562, at *6 (D. Mass. Feb. 9, 2024) ("[T]he continuing doctrine exception is not meant for unlawful employment practices that can be narrowed to a discrete act that independently would be easy to identify as improper or discriminatory."); *see also Celestine v. Petroleos De Venezuela SA*, 108 F. App'x. 180, 182 n. 3 (5th Cir. 2004) ("This Court did not and still does not apply the continuing violation doctrine to discrete incidents such as training, hiring, and promotion.").

applies to a Charge filed by a commissioner. *See EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271-72 (11th Cir. 2002); *EEOC v. FAPS, Inc.*, No. 10-3095 JAP DEA, 2014 WL 4798802, at *24 (D.N.J. Sept. 26, 2014).

On its face, despite its broad sweep, the Charge fails to allege a single discriminatory practice or action against any group or individual and instead relies generically upon data reflecting then-current demographics for select Harvard faculty as of August 31, 2023. *See* Charge at 3. The cited data thus cannot refer to any discrete employment action occurring after September 1, 2023, meaning that any discrimination claims based on the data referenced in the Charge are untimely. As such, the Charge is untimely in its entirety. This necessarily deprives the EEOC of jurisdiction to issue the instant Subpoena. *See, e.g.*, *Ocean City Police Dep't*, 820 F.2d at 1380.

**2. The Charge Is Vague and Overbroad and Offers an Incoherent Theory of Discrimination.**

*First*, as noted in Harvard's May 27, 2025, Position Statement, the Charge does not identify any specific aggrieved individual, any specific comparators, any specific decisionmakers, nor any specific decision. This lack of specificity necessarily invites impermissible "fishing expeditions," rendering the Charge invalid. *See United Air Lines, Inc.*, 287 F.3d at 653; *see also* 5/25/2025 Position Statement at 22.

*Second*, the Charge is extremely broad in scope, purporting to cover a group of aggrieved individuals consisting of "all employees, former employees, prospective employees, and current and prospective training program applicants and participants who are white, Asian, male, non-black, non-Native American, or Straight." *See* Charge at 5. Because it is phrased in the disjunctive, it effectively covers every Harvard employee except those individuals who are simultaneously non-white, non-Asian, female, black, Native American, and non-heterosexual. Every other individual not ticking *all* of those boxes is a potentially aggrieved individual.

*Third*, this overly expansive definition of "aggrieved individuals" produces inconsistent and absurd results where Harvard allegedly discriminated against essentially everyone in favor of (apparently) everyone else. A theory of discrimination where members of protected categories are simultaneously treated more favorably and less favorably is not a theory of discrimination at all. It is well settled that "[a] plaintiff cannot establish a prima facie case of racial discrimination by showing that, in a large department, a coworker of another race was treated more favorably than he, though other coworkers of his race were treated more favorably than other coworkers of other races." *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir. 1993); *see, e.g.*, *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998) ("[T]o hold otherwise would be to permit the inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably"); *English v. Colorado Dep't of Corr.*, 248 F.3d 1002, 1012 (10th Cir. 2001) (same). The same logic applies here, where the EEOC's theory of discrimination depends on supposed "aggrieved individuals" allegedly receiving both more and less favorable treatment.

Title VII does not permit internally inconsistent theories of discrimination or allow plaintiffs to have it both ways by ignoring relevant comparators. In other words, "an individual cannot 'pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than she.'" *Alinoski v. Musculoskeletal Transplant Found., Inc.*, 679 F. App'x 224, 226–27 (3d Cir. 2017) (quoting *Simpson*, 142 F.3d at 646–47).

The Charge fails this basic requirement of coherence. Under the Commission's theory of discrimination, for example, a black male could be favorably treated due to his status as a black person, and a victim of discrimination due to his status as a male. *See id.* Similarly, a hypothetical Asian female

could both be more favorably treated due to her status as a female, and a victim of discrimination due to her status of being Asian.

For the foregoing reasons, the Charge fails the basic requirements that it identify aggrieved persons, the employment positions at issue, the method of discrimination, and a coherent theory of discrimination. *Shell Oil*, 466 U.S. at 73. Because the Charge is invalid, the EEOC lacks jurisdiction to investigate it, and the Subpoena should be revoked.

#### 3. The Charge's Presumption of Liability Based on Demographic Data Violates Executive Order 14281.

The Charge also fails because it is a disfavored "disparate impact" claim. To start, the Charge relies exclusively on neutral statistics reflecting demographic shifts in the composition of Harvard's faculty over time, and counterfactually assumes, ipso facto, that unlawful discrimination has occurred. The data cited in the Charge does not identify any discrete employment action *by Harvard*, as opposed to, for example, voluntary separations or retirements. Disparate demographic data without any connection to a specific employment practice is not evidence of discrimination. *See Ray v. Ropes & Gray LLP*, 799 F.3d 99, 116 (1st Cir. 2015) (noting that "bare statistics alone" do not support an inference of discrimination).[6]

Moreover, on April 23, 2025, two days before the Charge was filed, President Trump issued Executive Order 14281, entitled "Restoring Equality of Opportunity and Meritocracy." That Executive Order states: "It is the policy of the United States to eliminate the use of disparate-impact liability in all contexts to the maximum degree possible to avoid violating the Constitution, Federal

---

[6] *See also LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993) ("[A] company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when dismissing a particular individual.") (citations omitted); *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988) ("[W]e note that the plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged.").

civil rights laws, and basic American ideals." *See* Exec. Order No. 14,281, *Restoring Equality of Opportunity and Meritocracy*, 90 Fed. Reg. 17,537 (Apr. 23, 2025). To that end, it directs all federal agencies, including the EEOC, to "deprioritize enforcement of all statutes and regulations to the extent they include disparate-impact liability, including but not limited to 42 U.S.C. § 2000e-2[,]" including pending "investigations" and "positions taken in ongoing matters . . . that rely on a theory of disparate-impact liability[.]" *See* Exec. Order No. 14281 §§ 4, 6.

Here, there is nothing in the Charge (nor anything that has been revealed in the investigation) indicating that any shift in the demographic representation among Harvard's faculty reflects anything other than the shift in the demographic representation of academia at large. Data from the National Center for Education Statistics indicates that from 1987 to 2022 the representation of female faculty in academia has risen from 33.2 to 51.5 percent,[7] and that from 2010 to 2023, the number of white doctoral degree holders decreased from 73.2 to 62.2 percent.[8] These statistics are consistent with findings published in the American Council on Education indicating the rise of non-white faculty in academia as a whole.[9]

In essence, the Charge improperly identifies a "difference[] in outcomes" and asserts "a presumption of unlawful discrimination," without reference to any "facially discriminatory policy or practice or discriminatory intent[.]" Exec. Order No. 14,281 § 1. In the absence of any allegations of

---

[7] *Nat'l Ctr. for Educ. Stats., U.S. Dep't of Educ., Number of Faculty in Degree-Granting Postsecondary Institutions, by Employment Status, Sex, Control, and Level of Institution: Selected Years, Fall 1970 Through Fall 2022*, tbl.315.10, Digest of Educ. Stats. (Nov. 2023), https://nces.ed.gov/programs/digest/d23/tables/dt23_315.10.asp.

[8] *Nat'l Ctr. for Educ. Stats., U.S. Dep't of Educ., Number and Percentage Distribution of Doctor's Degrees Conferred by Postsecondary Institutions, by Race/Ethnicity and Sex of Student: Selected Academic Years, 1976–77 Through 2022–23*, tbl.324.20, Digest of Educ. Stats. (Dec. 2024), https://nces.ed.gov/programs/digest/d24/tables/dt24_324.20.asp.

[9] Kim, Ji Hye "Jane," Maria Claudia Soler, Zhe Zhao, and Erica Swirsky. 2024. Race and Ethnicity in Higher Education: 2024 Status Report. Washington, DC: American Council on Education.

discrete discriminatory acts against specific individuals, the Charge is invalid under the Executive Order No. 14,281, and the EEOC accordingly lacks jurisdiction to issue the instant Subpoena.

### C. The Subpoena Should Be Revoked Because It Is Independently Invalid.

In addition to the foregoing facial deficiencies of the underlying Charge, the Subpoena itself is invalid for five reasons: (1) it amounts to an unsupported fishing expedition intended to find evidence of discrimination the EEOC currently lacks any basis to assert; (2) its requests and the Charge they purport to investigate are overbroad and unduly burdensome; (3) the burden imposed upon Harvard greatly outweighs the relevance of information the EEOC seeks; (4) the Subpoena Requests are so vague that they are boundless in scope; and (5) it was improperly served upon Harvard.

#### 1. The Subpoena Constitutes an Impermissible Fishing Expedition.

The numerous facial deficiencies in the underlying Charge—including its temporal overbreadth (extending nearly seven years beyond the June 29, 2024 statute of limitations), fatal vagueness, the lack of a single specific aggrieved employee, and its exclusive reliance on neutral statistical data as disparate-impact-style evidence of discrimination—make clear that the Subpoena constitutes an impermissible fishing expedition calculated to uncover evidence of discrimination that the EEOC has no basis to allege.

The EEOC only has jurisdiction to issue subpoenas seeking information relevant to a *valid* charge. *United Air Lines*, 287 F.3d at 653. "The requirement of relevance, like the charge requirement itself, is designed to cabin the EEOC's authority and prevent 'fishing expedition[s].'" *K-Mart Corp.*, 694 F.2d at 1066.

The breadth of the Subpoena demonstrates that the EEOC is casting an impermissibly wide net, without a clear idea what it is looking for. The Subpoena Requests are not targeted at any specific theory of discrimination. None are directed toward any aggrieved individuals with potentially valid claims. None are targeted at any school or department, or any decisionmaker. Instead, they demand

that Harvard identify all "faculty" and all "applicants" for "faculty" positions over an eight-year period, along with their demographic and employment information, *see* Subpoena Request Nos. 7-9, in the hopes the EEOC can find a basis for its unprecedented investigation. This lack of specificity is a product of the invalid Charge, which is itself based on irrelevant and untimely statistical data, and manufactured claims regarding Harvard's alleged policies. *See* Position Statement at 13-15.[10]

Courts have repeatedly declined to enforce similarly broad fishing expeditions that sought evidence of pattern-or-practice discrimination based on an "idle hope" that evidence of pattern-or practice discrimination would be uncovered. *See, e.g.*, *Ford Motor Credit Co*., 26 F.3d at 47 (declining to enforce request for applicant information for more than three years beyond the 300-day period preceding the date on which the charge was filed); *United Air Lines, Inc.,* 287 F.3d at 654 (declining to enforce subpoena for information related to "each and every benefit" provided to United Air Lines' France-based workforce and medical leaves of absence taken by "each United Airlines employee residing abroad" on the grounds that it was vastly disproportionate to the evidence underlying the Charge and unduly burdensome).[11]

As such, the Subpoena must be revoked because it is based on nothing more than an "idle hope" that evidence may be uncovered to support the invalid Charge.

---

[10] The lack of specificity in the Subpoena—and the EEOC's investigation broadly—is especially telling where courts are highly deferential to the decisionmaking processes at academic institution like Harvard. *See, e.g.*, *Kobrin v. Univ. of Minnesota*, 34 F.3d 698, 704 n.4 (8th Cir. 1994) ("[C]ourts accord a high degree of deference to the judgment of university decisionmakers regarding candidates' qualifications for academic positions.") (collecting cases).

[11] *See also EEOC v. Forge Indus. Staffing Inc.*, 2014 WL 6673574, at *3 (S.D. Ind. Nov. 24, 2014) ("The relevance requirement is designed to 'prevent fishing expeditions,' and the EEOC must have 'a realistic expectation rather than an idle hope that something may be discovered.'"); *EEOC v. Austal USA, LLC*, 2017 WL 4563078, at *10 n. 10 (S.D. Ala. Aug. 18, 2017), report and recommendation adopted, 2017 WL 4562634 (S.D. Ala. Oct. 12, 2017) (denying enforcement of subpoena seeking information on 89 employees terminated under defendant's attendance policy because the "EEOC in this instance is improperly 'fishing' for evidence of pattern or practice discrimination" rather than seeking relevant to individual aggrieved employee identified in the Charge).

### 2. The Subpoena Is Overbroad and Imposes an Undue Burden.

The Subpoena should separately be revoked because its requests, as well as the Charge they purport to investigate, are unreasonably overbroad and would impose an undue burden on Harvard's operations. In evaluating the reasonableness of the burden imposed by a subpoena relative to its relevance, courts have cautioned against the application of rigid rules such as requiring an employer to establish that compliance would interfere with its normal business operations. *See, e.g.*, *Royal Caribbean Cruises, Ltd.*, 771 F.3d at 763. "What is unduly burdensome depends on the particular facts of each case and no hard and fast rule can be applied to resolve the question." *United Air Lines, Inc.*, 287 F.3d at 653 (quoting *FTC v. Shaffner*, 626 F.2d 32, 38 (7th Cir. 1980)). Reviewing courts must "weigh such equitable criteria as reasonableness and oppressiveness," which "impl[ies] a balancing of hardships and benefits." *Packard Elec. Div., Gen. Motors Corp.*, 569 F.2d at 318.

The Subpoena is overbroad and unduly burdensome for four main reasons, each premised on the practical realities of Harvard's decentralized hiring and promotion processes that have been detailed repeatedly to the EEOC since it opened its investigation.

**Requests Seeking to Identify "Applicants" for "Faculty Positions."** The Subpoena Requests seek substantial information about all faculty hires and applicants to faculty positions at Harvard over an eight-year period, including, (a) "all cover letters, Curriculum Vitas ('CVs'), and resumes for all applicants . . . to any faculty position during the relevant period [January 1, 2018 – present]," *see* Subpoena Request No. 7; (b) "all interview notes" for any applicant to any faculty position, *see* Subpoena Request No. 8; and (c) "searchable Excel spreadsheets by schools" containing data for each "applicant," including name; sex; race; position applied; whether the application resulted in a hire, promotion, or non-hire; date of hire, promotion or rejection; and name and title of the decisionmaker(s) of the employment decision, *see* Subpoena Request No. 9. Full compliance with

Subpoena Request Nos. 7-9 would require an enormous expenditure of resources that cannot be justified by any purported benefit to the EEOC's investigation.

To respond to these Subpoena Requests, Harvard would need to expend significant resources just to determine who qualifies as an "applicant" for a faculty position. The Subpoena defines "applicants" to include

> all individuals *who expressed interest in*, applied for, or were considered for employment with Respondent—*whether formally or informally*—by submitting applications, resumes, *or emails of interest* or by otherwise being evaluated for a posted or unposted position.

*See* Ex. A to Subpoena at 1 (emphasis added). To determine which individuals meet this definition, Harvard would first be required to identify all Harvard personnel who could possibly have received any "expression of interest" from any such individual over an eight-year period, determine whether and which Harvard personnel received any such communication, and then determine whether they "considered" or "evaluated" the individual for hire at Harvard as faculty.

Unlike some businesses, Harvard does not simply have an applicant portal for individuals to apply for open faculty positions at Harvard. The process for identifying and considering candidates is rigorous and entails several layers of review before candidates reach the point where they may be considered for a position. *See supra* § II.A. These processes differ from school-to-school and even within each school based on the type of faculty position. *See id.* In addition to the varying processes, there is no uniform practice across all Harvard schools for maintaining the related candidate information. *See id.*

Reproducing such a manual, indefinite, candidate-by-candidate process across the entire University over an eight-year period necessarily imposes an undue burden. *See EEOC v. Morgan Stanley & Co.*, 132 F. Supp. 2d 146, 162 (S.D.N.Y. 2000) (holding that attempting to comply with a demand for all "'informal complaints . . . would require a massive and unduly burdensome effort to interview practically everyone who works or recently has worked in a supervisory position.'").

Also, the definition of "faculty" in the Subpoena amplifies the undue burden because it requires Harvard to provide information regarding "instructional" and "post-doctorate positions." *See* Ex. A to Subpoena at 1. Requests related to "applicants" for "post-doctorate positions," as defined by the EEOC, require Harvard to produce information related to all individuals who applied for "post-doctorate positions" at Harvard, a term the EEOC does not define.

In addition, to the extent the EEOC seeks documents and information regarding Ph.D. students—as the EEOC has requested previously through RFIs—such students at Harvard are not faculty, regardless of whether they serve in teaching roles as a part of their post-graduate education. Including Ph.D. students as "faculty," impermissibly expands the Subpoena beyond the EEOC's authority because it does not have authority to investigate student or non-employees. *See Sanchez v. Brown Univ.*, 711 F. Supp. 3d 53, 55 (D.R.I. 2024) (recognizing that Title VII protections do not apply to non-employees and students); *Collier v. Austin Peay State Univ.*, 616 F. Supp. 2d 760, 770 (M.D. Tenn. 2009) (rejecting a graduate student's attempts to frame her relationship with school as an employer/employee in order to raise a discrimination claim).

**Requests Seeking to Identify "Interview Notes" and the Identities of Decisionmaker(s)."** Faculty hiring decisions at Harvard are the result of multiple levels of review by numerous individuals—within a school and at the University level—that drastically differ from traditional hiring processes and vary widely across schools and are designed to seek input from as many people as possible. *See supra* § II.A.

With this process in mind, the Subpoena's request for "all interview notes" alone is unduly burdensome. *See* Subpoena Request No. 8. Again, the definition of that term sweeps far broader than is reasonable or supported by the Charge's vague allegations. "Interview notes" includes:

> any handwritten, typed, or electronically recorded notes, summaries, outlines, or observations created by an employee, agent, or representative of Respondent in connection with an interview, intake conversation, or discussion with any applicant or job candidate. This includes, without limitation, notes made during or after the

> interview; annotated forms; summaries uploaded to database systems; or handwritten notes made on applications, CVs, or resumes.

*See* Ex. A to Subpoena at 1. To comply fully, Harvard would need to search all physical and electronic records, including emails communications, for any employee who may have commented in any way on an applicant after interacting with them *in any setting*. Identifying all individuals who may have responsive "interview notes" is, by itself, overly burdensome.

Beyond formal reports or recommendations, individuals involved in the hiring process may have materials that fall within the Subpoena's expansive definition of "interview notes." The demand for handwritten notes, including notes on applications, CVs, or resumes, would require physical inspections of individual workspaces and document storage locations across schools. This undertaking would require assistance from all employees—both staff and faculty—and would disrupt normal operations. Even identifying all individuals who may have reviewed any candidate's application over the last eight years, and thus potentially possess "interview notes," would require hundreds of hours of investigation.

The identification of all decisionmakers involved in these hiring processes—as requested in Subpoena Request No. 9—is likewise overly burdensome. Faculty hiring decisions typically involve multiple levels of review within each school or department, including search committees, faculty votes, and relevant deans. The University then conducts a separate review—either through an ad hoc or standing committee—and reaches yet another decision on the candidate's appointment.

Identifying all individuals who had authority throughout the process to affect a candidate's progression—thus acting as a "decisionmaker"—would be unduly burdensome on its own. This would require identifying substantial groups of individuals that changed over time—including all members of search committees, faculty voters, department chairs, deans, and ad hoc or standing committee members—and matching individuals who served in those capacities at a given time to individual to hiring decisions.

**Harvard's Decentralized Hiring and Promotion Structure.** The burden and complexity of gathering the information requested by Subpoena Request Nos. 7-9 is compounded by Harvard's decentralized organizational structure. The enormous undertaking outlined above for HSPH would need to be replicated across each of Harvard's 13 schools as well as central locations such as the Provost's and President's offices. Although the procedural details may vary, each of Harvard's other schools have similarly rigorous and expansive faculty hiring processes, typically involving input from all faculty members within the school or relevant department. Each school also has its faculty affairs office, administrative procedures, and document management systems for faculty hiring.

These systems may also vary *within* a school or department depending on the type of position being filled. Some positions may not be universally managed through any centralized administration, and thus documents related to those hiring decisions may be in numerous locations, including shared electronic folders or faculty email communications.

The lack of uniformity between—and even within—each of Harvard's schools creates challenges for locating and collecting responsive documents. Staff from each school or department must be consulted to determine the types of relevant documents maintained by the department; where and how those documents are maintained; who participated in each faculty hiring decision; and all potential custodians of relevant documents.

The burden imposed by Subpoena Request Nos. 7-9 is evident when examining the progress Harvard has made to date on the EEOC's more limited requests. The Third Set RFIs sought information regarding only those faculty members who were hired or promoted within five schools. To date, Harvard has produced approximately 400 CVs from the five selected schools, each related to faculty hired or promoted since June 29, 2024. Due to the decentralized nature of the schools' faculty hiring procedures, complying with this comparatively narrow request has been extremely burdensome. Production of these CVs has required identification of relevant hires over the period, multiple

interviews and communications with school staff to locate relevant documents, search for and collection of documents from multiple sources, and document processing and review. Thus far, the process to produce this limited subset of responsive documents has required months of work by Harvard. As compared to Subpoena Request No. 7, the production of this narrower subset, among other things, did not: (a) involve the production of documents pertaining to applicants; (b) correspond to all faculty hiring and promotions since January 1, 2018; or (c) cover all of the Harvard schools.

Courts have refused to enforce EEOC requests imposing far less burden than that contemplated by the Subpoena. *See, e.g.*, *Royal Caribbean Cruises, Ltd.*, 771 F.3d at 762 (declining to enforce unduly burdensome subpoena where "RCCL would be required to manually review and cross-reference paper documents relating to thousands of former employees . . . [and] be required to collect records from independent hiring partners concerning thousands of applicants who were not hired); *Forge Indus. Staffing*, 2014 WL 6673574, at *8 (holding subpoena imposed undue burden relative to minimal relevance where "Respondent processed 130,000 temporary employee applications" that were "not kept in a central repository, nor electronically in any form, and [c]ompliance with the subpoena would require Respondent to manually review each employment application maintained in paper format at each of its office locations, at an estimated time of 2,166 hours.").

**Requests for "Informal Complaints."** Subpoena Request Nos. 10 & 11 seek information related to all "informal . . . complaints, charges, and/or grievances" by any "faculty or faculty applicants" over an eight-year period. *See* Subpoena Request Nos. 10-11. These requests necessarily impose an undue burden because they are conceptually indeterminate. The Subpoena does not define "informal" nor provide any criterion to determine responsiveness. Courts often reject such indeterminate requests as self-evidently unduly burdensome. *See Morgan Stanley & Co.*, 132 F. Supp. 2d at 162 (declining to enforce subpoena for "all informal complaints" because "in a company the size of Morgan Stanley, with over 93,000 employees in 500 offices worldwide, attempting to comply with

a demand for all 'informal complaints,' even if that term could somehow be clearly defined, would require a massive and unduly burdensome effort to interview practically everyone who works or recently has worked in a supervisory position, in order to determine whether any employees ever questioned the fairness of their treatment.").

### 3. The Subpoena Is Impermissibly Vague, and Harvard Cannot Reasonably Respond Without Further Meeting and Conferring with the EEOC to Narrow Its Scope.

The Subpoena should also be revoked because the Subpoena Requests are so vague as to make them virtually boundless in scope. Administrative subpoenas are properly denied where they are too indefinite to inform the respondent of the scope of materials sought. *Cf. In re Grand Jury Subpoena: Subpoena Duces Tecum*, 829 F.2d 1291, 1302 (4th Cir. 1987) ("A subpoena duces tecum should not require the recipient to determine at his own peril what he is to do, without clear guidelines for compliance").

For purposes of illustration only, Harvard notes the indefiniteness of several of the Subpoena Requests as follows. *First*, Subpoena Request No. 4 appears to seek documents concerning "any hiring committee guidance in place" at Harvard since January 1, 2018. The Subpoena defines none of the quoted terms. Likewise, the Subpoena does not provide any criteria or explanation for the specific type of guidance the EEOC seeks. Hiring committees—as a general matter, not just at Harvard—can be guided by indefinite formal and informal considerations, and such considerations may be tied to the particulars of each position. Without any standard for Harvard to discern the guidance sought by the EEOC, this Subpoena Request is too indefinite to be enforced.

*Second*, Subpoena Request Nos. 10-11 are vague and ambiguous based on the use of the term "informal" as modifying "complaints, charges, and/or grievances." Such requests for informal complaints are often denied by courts because they are conceptually indefinite and would impose an undue burden on employers to comply. *See, e.g.*, *Morgan Stanley & Co.*, 132 F. Supp. 2d at 162 (finding

term "informal complaint" unduly vague and holding that attempting to comply with a demand for all "informal complaints" . . . . would require a massive and unduly burdensome effort to interview practically everyone who works or recently has worked in a supervisory position.").

*Third*, Subpoena Request Nos. 7-11 are rendered vague and ambiguous based on the definition of the term "applicant" in the Subpoena. The term "applicant" includes several indefinite modifiers, again without any criteria to assist Harvard in interpreting the EEOC's meaning. "[A]pplicants" is defined to include any individual that "expressed interest in" a faculty position by submitting "emails of interest," any individual that was "informally . . . considered" for a faculty position, and any individual that was "evaluated for" a position. The Subpoena provides no insight as to whom any interest was expressed, who might have "informally considered" the hypothetical applicant, or what it means to have "evaluated" an applicant (or by whom). Thus, to identify whether an individual is an "applicant," Harvard must answer whether any such individual "expressed interest" in a faculty position and was "considered" or "evaluated" for a faculty position, even if such consideration or evaluation was "informal." Just as courts reject requests from the EEOC for undefined "informal complaints," *see Morgan Stanley & Co.*, 132 F. Supp. 2d at 162, the Subpoena Requests seeking information regarding "applicants" that rely on similar indefinite evaluative language are fatally vague and unambiguous.

*Fourth*, Subpoena Request No. 12 seeks the production of documents "[f]or each school and for each year" that "reveal" the identities of "person(s) most knowledgeable" regarding Harvard's supposed "faculty diversification efforts." *See* Exhibit A at 6. Again, none of these quoted terms are defined in the Subpoena, and the Subpoena counterfactually assumes that Harvard actually engaged in "faculty diversification efforts." Likewise, it is not clear whether the Subpoena Request seeks the identities of individuals, for example, responsible for compliance with obligations imposed by the Office of Federal Contract Compliance Programs ("OFCCP") and its governing Executive Orders

and regulations. In any event, Harvard has repeatedly informed the EEOC that its theory that Harvard had a policy of "demographic diversification of [its] faculty," *see* Charge at 2, is baseless. *See* Exhibit C at 13-15; Exhibit G at 6. .

#### **4. The Burden Imposed by the Subpoena Outweighs the Minimal Relevance of Information Sought.**

The cost and burden the EEOC seeks to impose on Harvard is patently unreasonable when weighed against the vague and indefinite nature of the Charge, the absence of a single specific aggrieved employee, and the fact that relevant period is time-barred. The Charge that the Subpoena is purportedly designed to investigate is premised on neutral demographic statistics that, by law, the EEOC cannot interpret as evidence of discrimination. *See supra* § IV.B.

As the EEOC and the Commissioner are aware, the Charge is not linked to any previous charge or investigation by the EEOC. One would expect that a pattern-and-practice discrimination charge of historically unprecedented scope reaching back eight years would be based in at least one previous charge of discrimination premised on the same theory or conduct. And yet, that is not the case. Instead, the Charge and the accompanying investigation appear to be based on nothing more than the Commissioner's motivated (and pre-determined) speculation.

Under these circumstances, there is no basis for subjecting Harvard to the unprecedented burden the EEOC seeks to impose through the Subpoena. *See Ford Motor Credit Co.,* 26 F.3d at 47 (declining to enforce EEOC request for applicant data predating any timely claim of discrimination by more than three years).

#### **5. The Subpoena Was Improperly Served on Harvard.**

The Compliance Manual specifies that "[t]he person serving the subpoena must execute the Proof of Service." *See* EEOC Compliance Manual (Vol. 1) § 24.7. To effectuate service, the "Proof of Service" must contain, for "self-explanatory" reasons, the "Signature and official title" of the person

serving the subpoena. *Id.* § 24.7(c).

Here, the "Proof of Service" is defective. According to the Proof of Service, "Samantha Salazar" purportedly served the Subpoena, but the EEOC failed to include a digital signature validating her identity and official title. By omitting this critical information, the Subpoena is invalid. *Cf. Morawski v. Farmers Tex. Cnty. Mut. Ins. Co.*, No. 3:14-mc-21-D-BN, 2014 WL 717170, at *2 (N.D. Tex. Feb. 25, 2014) (holding that lack of evidence that a party properly served their subpoena, "render[ed] the subpoenas invalid").

### D. The Subpoena Should Be Revoked Because It Was Served Improperly in Retaliation for Harvard's Protected First Amendment Activity.

The EEOC's Charge and Subpoena are unlawful and, as far as Harvard can tell, unprecedented. The list of shortcomings and procedural abnormalities is long and striking. The EEOC refused to meet and confer with Harvard regarding the RFIs prior to issuing the Subpoena and then improperly served it. The Subpoena rests on an invalid Charge because the allegations of discrimination within the Charge are untimely, the Charge is vague and overbroad, and the Charge's presumption of liability based on neutral demographic data is insufficient to state a Title VII claim and violates Executive Order No. 14,281. Moreover, the Subpoena itself is independently invalid for numerous reasons, including that it constitutes an impermissible fishing expedition, is overbroad and imposes an undue burden on Harvard, is impermissibly vague, and the burden imposed on Harvard is both unreasonable and oppressive when weighed against the Charge's shortcomings.

All told, the circumstances demonstrate that the EEOC is not engaged in a good-faith investigation, but rather is part of the federal government's retaliatory campaign against Harvard. In April 2025, the Government demanded that Harvard transform its governance and curriculum to conform to the Government's vision, including ensuring that "the student body, faculty, staff and leadership" of every "department, field, or teaching unit" is "viewpoint diverse"; penalizing "faculty more committed to activism than scholarship"; and barring admission of foreign students "hostile"

to "American values and institutions." Exhibit AM (April 11, 2025 Letter). When Harvard refused to capitulate and allow the Government to control its institution, the Government retaliated by freezing billions of dollars in research support. *President & Fellows of Harvard Coll. v. U.S. Dep' of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 95-96 (D. Mass. 2025) ("funding suit"). Then, after Harvard sued to enjoin that freeze and asserted its First Amendment rights, the Government terminated funding, in further retaliation for Harvard's exercise of its constitutional rights. *Id.* at 136.

The Government did not stop there. In May 2025, the Government tried twice to expel Harvard's foreign students, only to be enjoined both times in court. *President & Fellows of Harvard Coll. v. DHS*, No. 1:25-CV-11472, 2025 WL 1479077 (D. Mass. May 23, 2025); *President & Fellows of Harvard Coll. v. DHS*, 788 F. Supp. 3d 182, 205, 209 (D. Mass. 2025). It has since sued Harvard twice: first, on February 13, 2026, accusing Harvard of unlawfully withholding admissions data "necessary to determine whether Harvard . . . is continuing to discriminate in its admissions process" ("admissions data suit"),[12] and again on March 20, 2026, alleging Title VI violations and breach of contract ("antisemitism suit").[13]

Meanwhile, the President publicly declared that the Government would revoke Harvard's tax-exempt status,[14] and multiple federal agencies opened several punitive investigations into Harvard's finances and compliance,[15] each calculated to punish Harvard for resisting the Government's efforts

---

[12] *See* Complaint at 1, United States v. President & Fellows of Harvard Coll., No. 1:26-cv-10844-MJJ (D. Mass Feb. 2, 2026).

[13] *See* Complaint, United States v. President & Fellows of Harvard Coll., No. 1:26-cv-11352-RGS (D. Mass Mar. 20, 2026).

[14] @realDonaldTrump, Truth Social (Apr. 15, 2025, 10:09 AM), https://tinyurl.com/4u7dmjdc; @realDonaldTrump, Truth Social (May 2, 2025, 7:25 AM), https://tinyurl.com/35wu7kpk.

[15] *See, e.g.*, Press Release, U.S. Department of Education Places Harvard University on Heightened Cash Monitoring for Financial Responsibility Concerns, U.S. Dep't of Educ. (Sept. 19, 2025), https://perma.cc/VBQ2-PQKJ; @usedgov, X.com (Sept. 19, 2025, 2:02 PM ET), https://perma.cc/XB4E-WPM7; Dhruv T. Patel & Grace E. Yoon, *Trump Admin Urges Reconsideration*

to control the viewpoints of Harvard students and faculty and restructure Harvard's curriculum, leadership, and governance to suit the Government's views.

The Government has not concealed that its all-out campaign targets Harvard for the assertion of its constitutional rights. To the contrary, the Government has time and again revealed its retaliatory intent—for example, when the President declared that "[e]very time [Harvard] fight[s], they lose another $250 million,"[16] or when he stated that "Harvard has been, for a long time, behaving very badly" such that the Government now would seek $1 billion from it, and that the government "want[s] nothing further to do, in the future, with Harvard University."[17]

The timing and irregularity of the EEOC's actions demonstrate that the Charge and this Subpoena are the latest attempt to punish Harvard for exercising its First Amendment rights. The Charge was served just four days after Harvard filed its Complaint in the funding suit. The day after the district court granted summary judgment in Harvard's favor, *President & Fellows of Harvard Coll.*, 798 F. Supp. 3d at 137-38, the EEOC escalated its tactics and informed Harvard that starting on September 22, 2025, and continuing for the remainder of that week, the Lead System Investigator planned to conduct an on-site visit for the purpose of interviewing multiple senior Harvard officials. Exhibit U. That same day, the EEOC emailed counsel for Harvard, threatening to issue a subpoena compelling compliance with its RFIs on September 9, 2025, if it did not receive responses it deemed

---

*of Harvard's Accreditation Status*, Harvard Crimson (July 9, 2025), https://www.thecrimson.com/article/2025/7/9/harvard-trump-accreditation-status-reconsider/; U.S. Dep't of Educ., *U.S. Department of Education's Office for Civil Rights Opens Two New Probes into Harvard University for Continued Discrimination on Campus* (Mar. 23, 2026), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-opens-two-new-probes-harvard-university-continued-discrimination-campus.

[16] *Trump Says Harvard Must Show List of Foreign Students (Full Q&A)*, YouTube (Bloomberg Podcasts May 28, 2025), at 0:54, https://www.youtube.com/watch?v=L6yjpvZTbjA.

[17] Donald Trump (@realDonaldTrump), Truth Social (Feb. 2, 2026, at 23:20 ET), https://tinyurl.com/y73jkaax.

"full and complete" on the previously agreed due-date of September 8, 2025. Exhibit AN. Then, just four days after Harvard moved to dismiss the admissions suit, the EEOC issued the Subpoena.

The Subpoena—and the Charge it is purportedly intended to investigate—is motivated by the unlawful desire to punish Harvard for its protected First Amendment litigation activity. *Cf. Perkins Coie LLP v. U.S. Dep't of Justice*, No. CV 25-716 (BAH), 2025 WL 1276857, at *34 (D.D.C. May 2, 2025) (finding that a retaliatory, targeted investigation by the EEOC violated the First Amendment, Equal Protection, and Due Process); *see id.* ("By not following its own procedures, the EEOC has undermined the legitimacy of its own investigation, revealing this investigation of plaintiff to be a product of the retaliation ordered by EO 14230 rather than any legitimate investigative activity."). As a result, a court may refuse to enforce the Subpoena. *See United States v. Powell*, 379 U.S. 48, 58 (1964) ("[A] court may not permit its process to be abused."); *see also id.* (explaining that process may be denied if brought for an "improper purpose," such as to "harass" or "to put pressure on [respondent] to settle a collateral dispute"); *United States v. Tivian Labs., Inc.*, 589 F.2d 49, 54 (1st Cir. 1978) ("[W]hat the fourth amendment requires as a condition to enforcement of an agency subpoena is a showing by the agency [] that its investigation is authorized by Congress and is for a purpose Congress can order[.]").

## V. <u>CONCLUSION</u>

For the foregoing reasons, Respondent respectfully requests that Subpoena No. HU-A26-02, and each request contained therein, be revoked in its entirety.

Dated: June 18, 2026

Respectfully submitted,

KING & SPALDING LLP

BY: ______________________

Amanda A. Sonneborn
asonneborn@kslaw.com
Peter J. Wozniak
pwozniak@kslaw.com
Andrew R. Cockroft
acockroft@kslaw.com
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
Telephone: +1 312 995 6333
Facsimile: +1 312 995 6330

Attorneys for Respondent
President and Fellows of Harvard College