**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br>*Applicant*,<br>v.<br>HARVARD UNIVERSITY,<br>*Respondent*. | Case No. 1:26-mc-91522-AK<br>(Leave to file granted on November 6, 2026) |

**HARVARD'S MEMORANDUM IN RESPONSE TO COURT'S ORDER TO SHOW CAUSE AND IN OPPOSITION TO EEOC'S APPLICATION TO ENFORCE ADMINISTRATIVE SUBPOENA**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 3

A. The Government Demands Control Over Harvard's Academic Decisions. ........ 3

B. The Government Retaliates After Harvard Rejects Its Demands. ........ 4

C. The Charge is Issued as Part of the Government's Continued Retaliation. ........ 6

D. The EEOC Escalates After Harvard Prevails in the Funding Litigation. ........ 8

E. The EEOC Issues the Subpoena After Harvard Moves to Dismiss the Admissions Suit. ........ 10

ARGUMENT ........ 12

I. The Subpoena Was Issued for an Improper Purpose. ........ 13

II. The Subpoena's Historical Reach Exceeds What is Relevant to the Charge. ........ 18

III. The Subpoena is Overbroad and Imposes Undue Burdens on Harvard. ........ 20

IV. The Subpoena's Demands Are Too Indefinite to Enforce. ........ 24

CONCLUSION ........ 25

CERTIFICATE OF SERVICE ........ 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*,
836 F. Supp. 3d 459 (D.R.I. 2026)....16

*In re Admin. Subpoena No. 25-1431-019*,
800 F. Supp. 3d 229 (D. Mass. 2025)....13, 16, 18

*Asociación de Educación Privada de P.R., Inc. v. García-Padilla*,
490 F.3d 1 (1st Cir. 2007)....13

*Blasdel v. Nw. Univ.*,
687 F.3d 813 (7th Cir. 2012)....13, 14

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011)....14

*EEOC v. Citicorp Diners Club, Inc.*,
985 F.2d 1036 (10th Cir. 1993)....21

*EEOC v. First Ala. Bank of Birmingham*,
440 F. Supp. 1381 (N.D. Ala. 1977)....15

*EEOC v. Ford Motor Credit Co.*,
26 F.3d 44 (6th Cir. 1994)....19, 20, 22

*EEOC v. Morgan Stanley & Co.*,
132 F. Supp. 2d 146 (S.D.N.Y. 2000)....21, 24, 25

*EEOC v. Royal Caribbean Cruises, Ltd.*,
771 F.3d 757 (11th Cir. 2014)....21

*EEOC v. Shell Oil Co.*,
466 U.S. 54 (1984)....18

*EEOC v. United Air Lines, Inc.*,
287 F.3d 643 (7th Cir. 2002)....18, 19, 20

*Lee v. Howard Hughes Med. Inst.*,
607 F. Supp. 3d 52 (D. Mass. 2022)....14

*McLane Co. v. EEOC*,
581 U.S. 72 (2017)....13, 18, 20, 24

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002)....19

*NLRB v. Champagne Drywall, Inc.*,
502 F. Supp. 2d 179 (D. Mass. 2007) ........................................................................20

*Perkins Coie LLP v. U.S. Dep't of Just.*,
783 F. Supp. 3d 105 (D.D.C. 2025) ..............................................................13, 15, 17

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*,
798 F. Supp. 3d 77 (D. Mass. 2025) ........................................................2, 8, 9, 15, 18

*Regents of Univ. of Mich. v. Ewing*,
474 U.S. 214 (1985)..........................................................................................13

*Texas v. EEOC*,
933 F.3d 433 (5th Cir. 2019) ..............................................................................20

*United States v. Comley*,
890 F.2d 539 (1st Cir. 1989).......................................................................12, 13, 18, 24

*United States v. Powell*,
379 U.S. 48 (1964).............................................................................................12, 13, 18

*Univ. of Pa. v. EEOC*,
493 U.S. 182 (1990).............................................................................................16, 17, 18

*Vargas-Figueroa v. Saldana*,
826 F.2d 160 (1st Cir. 1987).......................................................................................14

*Villanueva v. Wellesley Coll.*,
930 F.2d 124 (1st Cir. 1991)..................................................................................14, 23

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000).....................................................................................13, 16

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
784 F. Supp. 3d 127 (D.D.C. 2025) ........................................................................14

**Constitutional Provisions**

U.S. Const. amend. I ...................................................................................................14

**Statutes**

42 U.S.C. § 2000e-5.......................................................................................3, 7, 19

42 U.S.C. § 2000e-8..........................................................................................18, 23

42 U.S.C. § 2000e-12...............................................................................................20

**Regulations**

29 C.F.R. § 1608.1 (2025) ........................................................................................20

41 C.F.R. § 60-2.17 (2024) ........................................................................................20

**Other Authorities**

@realDonaldTrump, Truth Social (Apr. 15, 2025, 10:09 AM ET), https://tinyurl.com/4u7dmjdc ........................................................................................5

@realDonaldTrump, Truth Social (Apr. 16, 2025, 7:05 AM ET), https://tinyurl.com/yww6nfw7 ........................................................................................5, 23

@realDonaldTrump, Truth Social (Apr. 24, 2025, 9:33 AM ET), https://tinyurl.com/y84mntt2 ........................................................................................6, 15

Aaron Sibarium, *EXCLUSIVE: Trump Administration Launches Civil Rights Probe of Harvard's Hiring Practices*, Wash. Free Beacon (May 12, 2025), https://perma.cc/AQ7X-J558 ........................................................................................7

Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ.: Off. of the President (Apr. 14, 2025), https://perma.cc/L4G7-J8UB ........................................5

*Commission Votes: August 2026*, U.S. Equal Emp. Opportunity Comm'n, https://perma.cc/R24X-DL6U (last visited Nov. 6, 2026) ........................................12

EEOC, *Commissioner Charges*, https://perma.cc/UV8G-QA4C ........................................2

EEOC Compliance Manual (Apr. 19, 2006) ........................................................................................20

Lauren Weber, Trump Administration Takes Fight With Harvard to University's Hiring Practices, Wall St. J. (May 12, 2025) ........................................................7

Michael C. Bender, Alan Blinder & Jonathan Swan, *Inside Trump's Pressure Campaign on Universities*, N.Y. Times (Apr. 14, 2025) ........................................23

President Donald Trump Taking Questions in the Oval Office (Newsmax, aired May 28, 2025, 12:42 PM ET), https://perma.cc/ZUC6-3SP6 ........................................8

Press Release, EEOC, EEOC Acting Chair Andrea Lucas Corrects EEOC's Course in Federal Sector, Promises Accountability and Reform (May 22, 2025), https://perma.cc/WH53-BY6S ........................................................................7

Statement of Andrea R. Lucas Before the Senate Committee on Health, Education, Labor, and Pensions (June 18, 2025), https://perma.cc/QX54-M44P ........................................................................................8

## INTRODUCTION

The EEOC paints its application as a run-of-the-mill request to enforce a typical investigative subpoena. But there is nothing ordinary about the EEOC's application, its subpoena, or the underlying investigation.

This application is the latest escalation in the Government's persistent, all-out campaign to punish Harvard for refusing to acquiesce to the Government's April 11, 2025 dictates on the faculty who teach at Harvard, what they teach, whom Harvard admits to study, and the overall viewpoints of those faculty and students. Specifically with respect to the hiring, promotion, and tenure of Harvard faculty—who lead both the teaching of students and, through their academic research, Harvard's mission to advance human knowledge—the Government said that Harvard "must" "audit" the "viewpoint[s]" held by its faculty in each Harvard department and hire a "critical mass" of new faculty where "viewpoint diversity" is lacking. Hours after Harvard refused to surrender its academic independence, on April 14, 2025, the Government froze federally funded work on life-saving research grants and contracts with a total value of more than $2.2 billion. Harvard sued to challenge that unlawful retaliatory freeze on April 21, 2025.

Immediately after Harvard filed that lawsuit, the Government unleashed a wave of retaliatory actions by almost every department in the Executive Branch. The U.S. Department of Homeland Security sought to bar Harvard from enrolling international students. The President urged the Internal Revenue Service to revoke its recognition of Harvard's tax-exempt status. The Department of Justice launched multiple investigations, including into Harvard's finances and admissions. The Departments of Education, Health and Human Services, and State did the same. The Departments of Commerce and Veterans Affairs also took action.

Most relevant here, just four days after Harvard sued to block the Government's unlawful funding freeze, Andrea Lucas, then-Acting Chair of the EEOC, issued a Commissioner's Charge

targeting Harvard's faculty composition and hiring.[1] *See* (Doc No. 1-3) (the "Charge"). The Charge was quickly and improperly leaked to the public, despite strict criminal prohibitions against publication of EEOC charges by the EEOC. The timing was not coincidental. The EEOC's actions came as part of the whole-of-government effort to make Harvard suffer for daring to defend its constitutional rights.

Harvard ultimately prevailed in its lawsuit against the Government's freeze (and subsequent termination) of federal research support to Harvard. A court in this District held in September 2025 that the Government's attempt to "overhaul [Harvard's] governance, hiring, and academic programs to comport with the government's ideology and prescribed viewpoint" violated the First Amendment. *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 118-19 (D. Mass. 2025).

The very day after Harvard won summary judgment and an injunction in that matter, the EEOC doubled down, demanding interviews with 10 senior Harvard officials, including the University's President and Provost. The EEOC demanded that those interviews, including of observant Jews, occur during Rosh Hashanah. The following day, the EEOC first threatened Harvard with a subpoena.

This subpoena is in clear and direct service of the Government's unconstitutional assault against Harvard, and this Court should deny the Government's application for four reasons. *First*, the subpoena serves an improper purpose: advancing the Government's retaliatory effort to control Harvard's protected academic decisions and punish it for exercising its First Amendment rights.

---

[1] Commissioner Andrea R. Lucas brought the Charge rather than any aggrieved individual. Such "Commissioner charges" are rare. From fiscal year 2015 through fiscal year 2024, the median number of new Commissioner charges was 14.5 per year, representing "far less than 1%" of the EEOC's annual charge volume. EEOC, *Commissioner Charges*, FAQ 7, https://perma.cc/UV8G-QA4C.

*Second*, the subpoena seeks information that is not relevant to the Charge because it seeks records beyond Title VII's requirement that evidence be relevant to the charge under investigation. It demands records that predate the 300-day filing period by many years, including some that are more than 20 years old, without explaining how those records could shed light on any timely allegations of discrimination.[2] That unexplained demand further confirms that the subpoena serves an improper purpose. *Third*, its sweeping demands impose an undue burden by requiring Harvard to reconstruct more than eight years of faculty hiring across thousands of faculty and staff involved in the processes for thousands of hiring, promotion, and tenure decisions across Harvard's 13 schools. *Fourth*, the subpoena's vague and indefinite terms leave Harvard unable to determine which records it must produce.

## BACKGROUND

### A. The Government Demands Control Over Harvard's Academic Decisions.

Harvard is the oldest institution of higher education in the United States and one of the world's leading research universities. Harvard employs more than 20,000 faculty and staff across its central administration, Harvard College, 12 graduate and professional schools, and the Harvard Radcliffe Institute. Declaration of Nina Zipser dated November 6, 2026 ("Zipser Decl.") ¶ 2.

The Government has made clear that it wants Harvard to change the composition of its faculty, along with its hiring and promotion practices. On April 3, 2025, the Government sent Harvard a list of "pre-conditions" it "must comply with" to continue receiving federal funds. Declaration of Steven P. Lehotsky dated November 6, 2026 ("Lehotsky Decl.") Ex. 1 at 1. The letter identified changes to academic programs and departments to "improve viewpoint diversity"

---

[2] A Title VII charge must be filed within 300 days of the challenged action. 42 U.S.C. § 2000e-5(e)(1).

and "end ideological capture" as two of those conditions. *Id.* at 2-3. The Government sent Harvard a "menu" of proposals that same day, including "[n]ew hires (including tenure track) to promote viewpoint diversity and free exchange of ideas," "cluster hiring across the University," new "criteria for faculty hiring and tenure, with emphasis on intellectual diversity," and "[e]nd[ing] prioritization of 'activists' and DEI criteria." Lehotsky Decl. Ex. 2 at 4-6.

The Government expanded those demands on Friday, April 11, 2025, requiring access to hiring data for audits and direct oversight of faculty composition as a precondition for Harvard to maintain an ongoing research relationship with the federal Government. It directed Harvard to commission an outside party—one that must be acceptable to the Government—to audit Harvard's faculty, staff, and leadership "for viewpoint diversity, such that each department, field, or teaching unit must be individually viewpoint diverse." Lehotsky Decl. Ex. 3 at 2. Any department or field "found to lack viewpoint diversity must be reformed by hiring a critical mass of new faculty … who will provide viewpoint diversity." *Id.* at 3. "All hiring and related data" must be shared with the Government for "a comprehensive audit." *Id.* at 2. Harvard also had to "reduc[e] the power held by faculty (whether tenured or untenured) and administrators more committed to activism than scholarship" and "empower[] … exclusively those most devoted" to implementing the Government's demands. *Id.* at 1. The Government demanded annual viewpoint audits and corrective measures, with continuing federal oversight of these reforms through at least the end of 2028. *Id.* at 5.

**B. The Government Retaliates After Harvard Rejects Its Demands.**

Harvard rejected the Government's demands on Monday, April 14, 2025. Harvard explained that the Government's demands were "in contravention of the First Amendment" and "invade[d] university freedoms long recognized by the Supreme Court." Lehotsky Decl. Ex. 4 at 1-2. Harvard refused to "surrender its independence or relinquish its constitutional rights" or

"allow itself to be taken over by the federal government." *Id.* at 2. Harvard said that it remained open to further dialogue, but that it would not agree "to demands that go beyond the lawful authority of this or any administration." *Id.* Harvard further explained publicly that the Government's demands "represent[ed] direct governmental regulation of the 'intellectual conditions' at Harvard."[3] "No government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue."[4]

Within hours of Harvard's letter and statement, the Government announced a freeze on funding for grants and contracts with total value of more than $2.2 billion. Lehotsky Decl. Ex. 5. The next day, the President attacked Harvard's "ideological … '[s]ickness'" and threatened to revoke Harvard's tax-exempt status.[5] Shortly thereafter, the President accused Harvard of "hiring almost all woke, Radical Left, idiots and 'birdbrains.'"[6] He continued by stating "[m]any others, like these Leftist dopes, are teaching at Harvard, and because of that Harvard can no longer be considered even a decent place of learning."[7] On April 21, 2025, Harvard sued to challenge the funding freeze. *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-11048 (D. Mass. Apr. 21, 2025) (the "Funding Litigation"). Over the ensuing months, the Government expanded its retaliatory campaign—trying multiple times to bar Harvard from enrolling international students and launching investigations into its finances, admissions

[3] Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ.: Off. of the President (Apr. 14, 2025), https://perma.cc/L4G7-J8UB.

[4] *Id.*

[5] @realDonaldTrump, Truth Social (Apr. 15, 2025, 10:09 AM ET), https://tinyurl.com/4u7dmjdc.

[6] @realDonaldTrump, Truth Social (Apr. 16, 2025, 7:05 AM ET), https://tinyurl.com/yww6nfw7.

[7] *Id.*

practices, and even patent licensing. Several of these disputes are also being litigated in this District or the First Circuit.[8]

### C. The Charge is Issued as Part of the Government's Continued Retaliation.

On April 25, 2025, only four days after Harvard filed suit and the very day after the President again attacked Harvard as a "Far Left Institution" and a "Liberal mess," accusing it of "allowing a certain group of crazed lunatics to enter and exit the classroom" to teach,[9] EEOC Acting Chair Andrea Lucas issued the Commissioner's Charge underlying this proceeding. (Doc No. 1-3). The Charge alleges Harvard engaged in a pattern and practice of discrimination against white, Asian, male, or straight employees, applicants, and training-program participants, dating back to 2018, and based solely on the overall demographic composition of Harvard's faculty. It does not purport to investigate *any* individual claims of discrimination; rather, it initiates an expansive and burdensome investigation of every single employment decision at each of Harvard's schools spanning eight years on the absurd theory that Harvard was intentionally discriminating against every person who is not simultaneously a woman or non-binary and also non-heterosexual, Black, and Native American.

The Charge's circumstances are indeed highly irregular. To start, it is a Commissioner's Charge—a category which accounts for "far less than 1%" of the EEOC's annual charge volume. *See supra* n.1. Notwithstanding the existence of an EEOC office in Boston, the Acting Chair

---

[8] The parties have litigated four other matters in this District or the First Circuit. *See United States v. President & Fellows of Harvard Coll.*, No. 26-cv-10844-MJJ (D. Mass.) (recently dismissed Government suit seeking admissions records); *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-2230 (1st Cir.) (Government's appeal of permanent injunction barring retaliatory funding cuts); *President & Fellows of Harvard Coll. v. DHS*, No. 25-1627 (1st Cir.) (Government's appeal of preliminary injunction blocking the proclamation restricting entry by international students); *United States v. President & Fellows of Harvard Coll.*, No. 26-1978 (1st Cir.) (Government's appeal of the dismissal of its Title VI antisemitism suit).

[9] @realDonaldTrump, Truth Social (Apr. 24, 2025, 9:33 AM ET), https://tinyurl.com/y84mntt2.

assigned the Charge to be investigated by its Houston Office, even though there is no connection to Texas. Declaration of Peter J. Wozniak dated November 6, 2026 ("Wozniak Decl.") Ex. 1. Further, although Title VII makes it a crime for the EEOC or any of its officers or employees to make a charge public without the consent of the employer, 42 U.S.C. § 2000e-5(b), a copy nonetheless appeared in *The Washington Free Beacon* just a few weeks after the Charge's issuance and in the midst of the Government's termination of all of Harvard's research grants and contracts.[10] Harvard never released nor consented to the release of the Charge, and because Acting Chair Lucas filed the Charge, there is no nongovernmental party to the Charge who could have made it public.[11] Just 10 days after the Charge was leaked, Chair Lucas described the EEOC as "accountable to the President's authority."[12]

On May 27, 2025, Harvard responded to the Charge, challenging the investigation's retaliatory purpose and explaining Harvard's hiring practices. Harvard stated that it hires "based on merit and achievement" by "seek[ing] the best educators, researchers, and scholars," uses neither "quotas" nor "ideological litmus tests," and does not use DEI statements in hiring decisions. Wozniak Decl. Ex. 3 at 1. Harvard identified the Charge as "the latest attempt by the government to dictate educational decision-making at Harvard through pretextual and retaliatory agency actions." *Id.* at 2. Harvard also linked the Charge to the Government's use of funding cuts

---

[10] Aaron Sibarium, *EXCLUSIVE: Trump Administration Launches Civil Rights Probe of Harvard's Hiring Practices*, Wash. Free Beacon (May 12, 2025), https://perma.cc/AQ7X-J558. The Wall Street Journal described the investigation as "the latest escalation of the battle" between the Government and Harvard. Lauren Weber, Trump Administration Takes Fight With Harvard to University's Hiring Practices, Wall St. J. (May 12, 2025), https://perma.cc/ZE6Z-3HTT.

[11] If the Court does not deny enforcement on the current record alone, it should grant Harvard's accompanying alternative motion for leave to conduct limited discovery into the investigation's improper purpose, including the procedural irregularities and disclosure of the Charge.

[12] Press Release, EEOC, EEOC Acting Chair Andrea Lucas Corrects EEOC's Course in Federal Sector, Promises Accountability and Reform (May 22, 2025), https://perma.cc/WH53-BY6S.

as "leverage to gain control over academic decision-making," emphasizing that the Government's "funding freeze and the Charge appear to have the same aim: to unlawfully punish Harvard for its protected activity in opposition to the current administration's unlawful demands." *Id.* at 4-5.

The next day, the President publicly confirmed that Harvard's exercise of its rights prompted further punishment. He stated Harvard was "hurting [itself]" by "fighting."[13] In President Trump's words, "every time [Harvard] fight[s], they lose another $250 million."[14] "All [Harvard is] doing is getting in deeper and deeper and deeper. They've got to behave themselves."[15] In Chair Lucas's statement for her confirmation hearing, held about one month after the Charge was leaked, she boasted that she was "passionate about achieving" the President's agenda.[16] On August 1, 2025, the EEOC sent Harvard its first requests for information, which included 33 individual requests with 84 subparts. Wozniak Decl. ¶ 7.

**D. The EEOC Escalates After Harvard Prevails in the Funding Litigation.**

On September 3, 2025, the District Court granted summary judgment to Harvard on its First Amendment and Title VI claims, as well as injunctive relief against further governmental retaliation in violation of the First Amendment. *President & Fellows of Harvard Coll.*, 798 F. Supp. 3d at 117-33, 135-36. The court concluded that the Government's April 2025 demands sought to "overhaul [Harvard's] governance, hiring, and academic programs to comport with the government's ideology and prescribed viewpoint." *Id.* at 119. The court recognized that the First Amendment protects Harvard's "autonomous decisionmaking," including its "prerogative 'to

---

[13] President Donald Trump Taking Questions in the Oval Office at 6:01 (Newsmax, aired May 28, 2025, 12:42 PM ET), https://perma.cc/ZUC6-3SP6.

[14] *Id.* at 0:54.

[15] *Id.* at 5:10.

[16] Statement of Andrea R. Lucas Before the Senate Committee on Health, Education, Labor, and Pensions at 2 (June 18, 2025), https://perma.cc/QX54-M44P.

determine for itself on academic grounds who may teach,' and what is taught in the 'college classroom.'" *Id.* at 118-19 (citations omitted). It found that the April 11 demands targeted "these core freedoms," while Harvard's refusal "was aimed at preserving them." *Id.* at 119.

The very next day, the EEOC demanded on-site interviews with 10 senior Harvard officials, including the University's President and Provost, during Rosh Hashanah (the week of September 22). Wozniak Decl. Ex. 7 at 1. The day after that, before Harvard's agreed response deadline had lapsed, the EEOC emailed Harvard's counsel threatening a September 9 subpoena unless Harvard supplied a "full and complete response" to the August 1 information requests by September 8. Wozniak Decl. Ex. 8 at 1.

Harvard did so. It provided 3,491 pages of responsive information, including 67 Excel spreadsheets of data. Wozniak Decl. ¶ 10. Harvard also provided written responses and objections to the August 1 requests and offered to confer in an effort to come to an agreement on the scope of the requests. *Id.*

The following day, the EEOC served 97 *additional* requests with 248 subparts, principally concerning the student programs identified in the Charge. *Id.* ¶ 11. Harvard again provided written responses and objections and repeatedly offered to confer about the scope of the requests. *Id.* ¶ 18.

In February 2026, the EEOC proposed limiting its initial investigation to five schools. *Id.* ¶ 26. Harvard agreed to cooperate while preserving its objections and explained that collecting records dispersed across schools and departments would require substantial manual work. *Id.* ¶¶ 29-30. The EEOC served a third set of RFIs on March 6, 2026, seeking records related to those five schools. *Id.* ¶ 27. Harvard continued producing documents and offered 295.5 hours of availability across 77 business days to confer. *Id.* ¶¶ 31, 33. The EEOC never even responded to these offers to confer. *Id.* As of June 5, 2026, Harvard had produced over 9,000 pages of documents

to the EEOC in response to the EEOC's three sets of RFIs. *Id.* ¶ 35. Between March 20 and June 11, the Government did not respond whatsoever to Harvard's submissions or identify any deficiencies in them. *Id.* ¶ 34.

**E. The EEOC Issues the Subpoena After Harvard Moves to Dismiss the Admissions Suit.**

On June 8, 2026, just five days after Harvard moved to dismiss the Government's admissions-records suit and without responding to Harvard's repeated offers to confer,[17] the EEOC further escalated by issuing Subpoena No. HU-A26-02 (the "subpoena"). Without explanation, the EEOC abandoned its prior narrowed focus on five schools and gave Harvard just 14 days to produce hiring records across the entire University spanning more than eight years, and to produce additional records from as far back as 2005. (Doc No. 1-2); Wozniak Decl. Ex. 28 at 5-7.[18]

For the first time, the EEOC demanded records for *all* faculty applicants, regardless of whether they were hired, including every application, cover letter, resume, and curriculum vitae, together with *all* interview notes (whether electronic or handwritten) and school-specific spreadsheets identifying applicants' race and sex, hiring outcomes, and relevant employment decisionmakers. (Doc No. 1-2, Requests 7-9). The subpoena's definition of "applicant" encompasses anyone who merely expressed interest or was considered "whether formally or

[17] Although the Government claims to have "engaged in many discussions with the Respondent about the scope of the investigation and the lack of the required production," (Doc No. 1-1 at 11), the parties last conferred on December 15, 2025. Wozniak Decl. ¶ 23. Even then, the EEOC did not describe Harvard's production as deficient. *Id.* ¶ 24. Between that last conferral and the issuance of the subpoena, the EEOC failed to respond to Harvard's repeated offers for conferrals for approximately six months, and did not once criticize or question the rate or scope of Harvard's production. *Id.* ¶¶ 25-37.

[18] The following day, the EEOC issued a second subpoena, No. HU-A26-03, seeking further employment, compensation, demographic, and applicant data for Harvard's teaching and research positions over more than eight years. Wozniak Decl. ¶ 37. Harvard's petition to revoke or modify that subpoena remains pending before the EEOC, so it is not before this Court.

informally," including for any "unposted position[s]." (Doc No. 1-2 at 1). "Faculty" includes not only tenured and tenure-track professors but also visiting, adjunct, clinical, research, instructional, and postdoctoral positions. *Id.* The subpoena further demands records—some going back more than 20 years—concerning Harvard's diversity offices and initiatives, hiring guidance, diversity officials' roles and performance, discrimination complaints, including "informal" complaints, and related investigations. (Doc No. 1-2, Requests 1-6, 10-11); Wozniak Decl. Ex. 28 at 5-7.

Compliance with the subpoena would require Harvard to reconstruct all candidate interest as well as hiring and promotion over eight years and across 13 schools, each of which employs its own procedures.[19] Harvard does not maintain in the ordinary course of business records compiling the requested applicant information for every "applicant" as the subpoena defines that term. *See* Zipser Decl. ¶ 27; Claypoole Decl. ¶ 28. In particular, identifying "informal" expressions of interest would require manual, individualized inquiries beyond existing application records. *See* Zipser Decl. ¶ 20; Claypoole Decl. ¶ 25. In some instances, compliance "would not be possible" because the universe of individuals is not known or tracked. Claypoole Decl. ¶¶ 21, 28.

Even where responsive records might exist, locating and collecting them would require substantial faculty and staff time. For example, FAS alone conducted searches for approximately 1,389 faculty positions and received approximately 40,949 faculty applications since January 1, 2018, excluding "informal" applicants. Zipser Decl. ¶ 26. Merely identifying individuals who may possess responsive "interview notes" as demanded by the subpoena would require hundreds of hours before any search of their records could begin. *Id.* ¶ 21. Compliance would require

---

[19] The declarations submitted in support of this opposition demonstrate the varied appointment procedures at just two of Harvard's 13 schools. *See* Zipser Decl. ¶¶ 5-6, 11-14 (describing Faculty of Arts and Sciences ("FAS") appointment procedures); Declaration of Catherine Claypoole dated November 5, 2026 ("Claypoole Decl.") ¶¶ 9-19 (describing Harvard Law School ("HLS") appointment procedures).

approximately 1,015 FAS faculty and staff to spend thousands of hours and would cost an estimated $1.2 million in FAS faculty time alone. *Id.* ¶¶ 25-28.

The EEOC's bad-faith exercise of its subpoena authority cuts to the core of protected academic freedoms. Faculty hiring decisions depend on academic judgments about candidates' scholarship, teaching, and contributions to their fields. *See* Zipser Decl. ¶ 19; Claypoole Decl. ¶ 22. Those judgments require candid evaluations from faculty and outside scholars, who provide those assessments because they trust that their comments will remain confidential. *See* Zipser Decl. ¶¶ 16-17; Claypoole Decl. ¶¶ 23-24.

Harvard received the subpoena on June 11, 2026, and petitioned to revoke or modify it on June 18, challenging its retaliatory purpose, intrusion into protected academic decision making, indefiniteness, and extraordinary burden. (Doc No. 1-4). The EEOC denied the petition on August 31, 2026, in a party-line 2-1 vote, with the Commission's two Trump appointees forming the majority. Wozniak Decl. Ex. 29.[20] After service of the Determination on September 9, 2026, Harvard produced nearly two thousand pages over three weeks and again offered to confer. Wozniak Decl. ¶¶ 43-46. Following its pattern of escalating without responding to offers to confer, the Government filed this enforcement proceeding on September 29, 2026.

## ARGUMENT

A court "may not permit its process to be abused" through enforcement of an administrative subpoena. *United States v. Powell*, 379 U.S. 48, 58 (1964). The EEOC bears the initial burden of showing a proper purpose authorized by Congress, the relevance and adequate description of the information sought, and compliance with statutory procedures. *United States v. Comley*, 890 F.2d

[20] *Commission Votes: August 2026*, U.S. Equal Emp. Opportunity Comm'n, https://perma.cc/R24X-DL6U (last visited Nov. 6, 2026).

539, 541-42 (1st Cir. 1989). The employer can rebut the agency's asserted purpose with firm evidence of bad faith, *id.* at 542-43, and may also object based on relevance, undue burden, and indefiniteness, *McLane Co. v. EEOC*, 581 U.S. 72, 77 (2017).

**I. The Subpoena Was Issued for an Improper Purpose.**

Enforcing a subpoena issued for an improper purpose abuses the court's process. *Powell*, 379 U.S. at 58. Where an employer supplies "firm evidence" that the agency is pursuing an improper purpose, the court should deny enforcement. *Comley*, 890 F.2d at 542-43. Improper purposes include acting in bad faith, harassing the recipient, and punishing protected activity. *See id.*; *Powell*, 379 U.S. at 58; *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 160-61 (D.D.C. 2025). Courts assess evidence of improper purpose in context, considering the Government's public statements alongside the scope of its demands. *See In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 237-39 (D. Mass. 2025).

The First Circuit has said that the right to academic freedom "establish[es] a zone of First Amendment protection for the educational process itself." *Asociación de Educación Privada de P.R., Inc. v. García-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007) (citation omitted). That right encompasses not only "the independent and uninhibited exchange of ideas among teachers and students," but also the university's "autonomous decisionmaking." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985). It also includes the ability to "manage an academic community and evaluate teaching and scholarship free from [governmental] interference," *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) (citation omitted), and the "prerogative 'to determine for itself on academic grounds *who* may teach,'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 47 (2d Cir. 2000) (emphasis added) (citation omitted).

To be sure, Harvard may not (and does not) discriminate in employment on the basis of race or any other protected characteristic. Even in Title VII cases, courts respect universities'

academic judgments because second-guessing those judgments threatens academic freedom. *See Villanueva v. Wellesley Coll.*, 930 F.2d 124, 131 (1st Cir. 1991) (explaining that it is not for courts "to determine whether one professor is a more inspiring teacher, or another a more insightful scholar," because "[t]hose are matters intertwined with academic freedom"); *Vargas-Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir. 1987) (recognizing a "university's academic autonomy" to "run [its] own affairs"); *Lee v. Howard Hughes Med. Inst.*, 607 F. Supp. 3d 52, 66 (D. Mass. 2022) ("Subjective criteria, far from prohibited, are often vital to the tenure or renewal decisions of an academic entity."). Harvard's hiring decisions depend on precisely those judgments about candidates' scholarship and teaching. *See* Zipser Decl. ¶ 19; Claypoole Decl. ¶ 22. The Government has no entitlement to the records of all notes and all documents from all faculty involved in any way in hiring faculty. That is the opposite of being "free from [governmental] interference." *Blasdel*, 687 F.3d at 816.

The First Amendment also protects the right "to petition the Government for a redress of grievances," U.S. Const. amend. I, meaning "the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes," *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). Put simply, "[f]iling and pursuing lawsuits are forms of protected petitioning," *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 155 (D.D.C. 2025), that are "integral to the democratic process," *Borough of Duryea*, 564 U.S. at 388.

The Government's response to Harvard's exercise of both freedoms supplies firm evidence of the subpoena's improper purpose. The April 11 demands required Harvard to submit viewpoint audits, change its faculty hiring, and reduce authority for faculty whose views the Government opposed. Lehotsky Decl. Ex. 3. Those demands impermissibly sought to substitute the

Government's judgment for Harvard's protected academic decision making. *See President & Fellows of Harvard Coll.*, 798 F. Supp. 3d at 119 (finding the April 11 demands infringed Harvard's "core freedoms" by "purport[ing] to require Harvard to overhaul its governance, hiring, and academic programs to comport with the government's ideology and prescribed viewpoint").

Harvard then exercised its right to petition by challenging the Government's funding cuts in court. *See id.* at 119 n.20 ("[T]he filing of a lawsuit is quintessential First Amendment protected conduct."). Four days after Harvard sued—and one day after President Trump publicly attacked Harvard as a "Liberal mess" who allows "a certain group of crazed lunatics to enter and exit the classroom" to teach[21]—Commissioner Lucas issued the Charge targeting Harvard's faculty composition and hiring practices. The day after Harvard secured summary judgment and a permanent injunction, the EEOC demanded interviews with senior Harvard officials and then threatened a subpoena the following day. Wozniak Decl. Exs. 7-8. Five days after Harvard moved to dismiss the Government's admissions-records suit, the EEOC issued this subpoena. This sequence tracks the Government's express threats to punish Harvard for seeking (and obtaining) judicial relief. *See President & Fellows of Harvard Coll.*, 798 F. Supp. 3d at 122-23 (finding the Government's public statements about "Harvard's decision to 'fight'" evidence of retaliation); *see also Perkins Coie*, 783 F. Supp. 3d at 160-61 (finding the EEOC's investigation implemented the Government's retaliation for protected activity); *EEOC v. First Ala. Bank of Birmingham*, 440 F. Supp. 1381, 1385 (N.D. Ala. 1977) (denying enforcement where subpoena sought to retaliate against the employer's attorneys because of a previous litigation dispute), *aff'd*, 611 F.2d 132 (5th Cir. 1980) (per curiam).

---

[21] @realDonaldTrump, Truth Social (Apr. 24, 2025, 9:33 AM ET), https://tinyurl.com/y84mntt2.

The subpoena targets the very academic decisions the Government unsuccessfully sought to control through its April 11 demands. The Government demanded changes to faculty hiring criteria and access to "[a]ll hiring and related data." Lehotsky Decl. Ex. 3 at 2. The subpoena now seeks hiring guidance, applicant data and materials, and interview notes from those responsible for faculty hiring decisions. (Doc No. 1-2, Requests 4, 7-9). These demands would vitiate the confidentiality and expose to governmental review the private internal judgments and deliberations through which Harvard determines who may teach. *See* Zipser Decl. ¶ 19; Claypoole Decl. ¶ 22; *see Univ. of Pa. v. EEOC*, 493 U.S. 182, 198 (1990) (distinguishing the subpoena at issue in the case from "governmental attempts to influence the content of academic speech through the selection of faculty"); *Weinstock*, 224 F.3d at 47 (recognizing a university's "prerogative 'to determine for itself on academic grounds who may teach'" (citation omitted)). In that way, the subpoena targets the core of Harvard's academic freedom: the process by which it determines its own faculty. *See* Zipser Decl. ¶ 19; Claypoole Decl. ¶ 22.

The subpoena's massive breadth further reinforces its improper purpose. The subpoena seeks all documents from thousands of professors who participated in faculty hiring, promotion, and tenure decisions across 13 different schools and over eight years. As detailed further below, the requests are unreasonably expansive, and in direct service of the administration's goal of coercing Harvard. *See In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 239 (finding improper purpose where subpoena reflected the administration's publicly stated goals and sought overbroad categories of information); *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, 836 F. Supp. 3d 459, 471-72 (D.R.I. 2026) (finding improper purpose based on public statements showing the subpoena advanced the administration's policy goals rather than a legitimate investigation);

*Perkins Coie*, 783 F. Supp. 3d at 160-61 (finding the EEOC's investigation implemented retaliation directed by the administration rather than legitimate investigative activity).

The Government relies on Deputy Director Jeremy Crosbie's declaration and the Charge to try to establish a proper purpose, but neither overcomes the overwhelming evidence to the contrary. As the Government acknowledges, a declaration only suffices "on its own *absent* firm evidence of bad faith." (Doc No. 1-1 at 17) (emphasis added). Here, the firm evidence of the Government's bad faith is brazen and clear: public demands to control faculty hiring, public threats by the President to punish Harvard and attacks against the ideology of Harvard's faculty, and the EEOC's own abusive conduct. Harvard identified this evidence in its Petition to Revoke, (Doc No. 1-4 at 37-40), but the Government still offers no legitimate, plausible explanation for its repeated escalations after Harvard sought and obtained judicial relief against it. Neither the declaration nor the Charge overcomes that overwhelming evidence.

The Government's reliance on *University of Pennsylvania* is also misplaced. *See* (Doc No. 1-1 at 17). There, the Supreme Court rejected a claimed privilege against disclosure of confidential peer-review materials used in the tenure decision making process. *Univ. of Pa.*, 493 U.S. at 195-202. The EEOC fails to acknowledge, however, that the Court expressly recognized that "bad-faith exercise … of EEOC subpoena powers" could "raise First Amendment concerns." *Id.* at 201 n.8; *see also id.* (noting there was no allegation of bad faith by the EEOC in that case). The Court did not delimit "the precise contours of any academic-freedom right against governmental attempts to influence the content of academic speech *through the selection of faculty*." *Id.* at 198 (emphasis added); *see also id.* at 199 ("Nothing we say today should be understood as a retreat from this principle of respect for *legitimate* academic decisionmaking."). And the Court noted the university there did not allege the subpoenas were "intended to or will in fact direct the content of university

discourse toward or away from particular subjects or points of view." *Id.* at 198. Here, that is precisely what Harvard alleges. And the record here shows that the Government is using its investigative authority in "bad faith" to do precisely that. *Id.* at 201 n.8.

In determining improper purpose, "[c]ontext is important." *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 237-39. The Government has not been shy about expressing its desire to change the composition of Harvard's faculty in order to impose its own preferred viewpoints through the University. *See supra* pp.3-8. It is permanently enjoined from using federal funding as leverage to effectuate those unconstitutional changes. *President & Fellows of Harvard Coll.*, 798 F. Supp. 3d at 135-36. The Government now seeks to use this Court's compulsory process to advance the same improper ends of changing the ideology of Harvard's faculty. This Court should not be enlisted in service of an unconstitutional purpose. *Powell*, 379 U.S. at 58; *Comley*, 890 F.2d at 542-43.

## II. The Subpoena's Historical Reach Exceeds What is Relevant to the Charge.

The Court should also deny enforcement because the subpoena seeks information beyond the EEOC's investigative authority. The EEOC's authority extends only to evidence relevant to the charge. *EEOC v. Shell Oil Co.*, 466 U.S. 54, 64 (1984); 42 U.S.C. § 2000e-8(a). Relevance requires the court to examine the relationship between the materials sought and the particular matter under investigation. *McLane*, 581 U.S. at 81. Although relevance is construed broadly, that statutory limit cannot become a "nullity," *Shell Oil*, 466 U.S. at 68-69, and it exists to prevent "fishing expedition[s]," *EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 653 (7th Cir. 2002) (citation omitted). That is what the EEOC seeks here: The EEOC seeks to enlist this Court into making Harvard turn over records regarding each and every faculty employment decision over an eight-year period.

A Title VII charge, however, must be filed within 300 days of the alleged discriminatory employment practice. 42 U.S.C. § 2000e-5(e)(1). Each allegedly discriminatory hiring or promotion decision is a discrete act. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). For this Charge, filed April 25, 2025, the 300-day period began on June 29, 2024. Yet the Charge alleges discrimination since at least 2018 and the subpoena seeks records dating to January 1, 2018—*more than 2,000 days* before the 300-day filing period. (Doc No. 1-3 at 2-3); (Doc No. 1-2 at 1). Astonishingly, some of the subpoena's demands go back even further, more than 20 years, and concern the creation of a faculty development and diversity office that had a broad focus beyond hiring. (Doc No. 1-2, Request 1); Wozniak Decl. Ex. 28 at 5-7.

The Government does not explain why investigating current hiring or promotion decisions requires Harvard to produce the materials and interview notes of every applicant from every school for eight years prior. Earlier hiring actions and decisions cannot themselves support liability. The EEOC must show that older records will shed light on particular decisions made within the filing period. *See Morgan*, 536 U.S. at 113-15; *EEOC v. Ford Motor Credit Co.*, 26 F.3d 44, 47-48 (6th Cir. 1994). The EEOC argues older records *could* show discriminatory intent or a pattern, and the Charge's allegation of continuing discrimination warrants investigation back to 2018. (Doc No. 1-1 at 11-12). But that hypothetical possibility is the hallmark of a "fishing expedition[]." *United Air Lines*, 287 F.3d at 653 (citation omitted); *see Ford Motor Credit*, 26 F.3d at 47 (limiting a 12.5-year request of all employees' records because employees' histories would have "extremely tenuous" relevance).

The EEOC's demand also reaches back to years when federal policy expressly encouraged and, in fact, required the very efforts that the Charge alleges are discriminatory. When the EEOC issued the Charge and Subpoena, its own regulations still encouraged employers, including

Harvard, to adopt "practices and systems to improve employment opportunities for minorities and women." 29 C.F.R. § 1608.1(a) (2025). Its guidance likewise encouraged practices "designed to widen and diversify the pool of candidates." EEOC Compliance Manual § 15-IX (Apr. 19, 2006). And until January 2025, federal regulations implementing Executive Order 11246 *required* Harvard, as a federal contractor, to identify barriers to equal employment opportunity and make "good faith efforts" to remove them. *See* 41 C.F.R. § 60-2.17(b)-(c) (2024). The EEOC's cited cases do not establish the relevance of more than eight years of records, particularly when federal regulations required certain practices until just three months before the Charge.

If anything, the changing faculty demographics cited in the Charge reflect nothing more than Harvard's commitment to the goals that the Government, including during the first Trump administration between 2017-2021, required federal contractors to pursue for decades. Title VII shields employers who in good faith conform with and rely upon the EEOC's guidance, even if the guidance is later rescinded. 42 U.S.C. § 2000e-12(b); *see also Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) ("Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations."). So, launching a sweeping investigation in 2025 reaching back to 2018—and in part reaching back two decades—into practices that the Government itself encouraged or even required is not merely a fishing expedition, it is also further evidence of an improper purpose.

## III. The Subpoena is Overbroad and Imposes Undue Burdens on Harvard.

Even relevant demands should not be enforced if compliance imposes an undue burden. *McLane*, 581 U.S. at 77. The court must "weigh the likely relevance of the requested material to the investigation against the burden … of producing the material." *Ford Motor Credit*, 26 F.3d at 47. If an employer shows that "compliance would unduly disrupt and seriously hinder normal operations of the business," the court should deny enforcement. *NLRB v. Champagne Drywall,*

*Inc.*, 502 F. Supp. 2d 179, 181-82 (D. Mass. 2007) (quoting *EEOC v. Citicorp Diners Club, Inc.*, 985 F.2d 1036, 1040 (10th Cir. 1993)).

Here, the breadth of the requests does not justify the burden. For example, Requests 7-9 would require Harvard to reconstruct faculty searches across 13 schools dating to January 1, 2018. The Government demands every applicant's cover letter, CV, and resume; all interview notes; and new school-by-school spreadsheets recording each applicant's race, sex, position, hiring outcome, decision date, and decisionmakers. Its definition of "applicant" reaches individuals considered informally (a term the subpoena does not define) for unposted positions. Its definition of "interview notes" reaches handwritten annotations and observations from discussions with candidates. Harvard would have to identify past search participants, locate records across separate systems and individual files, match decisionmakers to particular hiring decisions, and create new compilations of the requested applicant data. *See* Zipser Decl. ¶¶ 18, 21-22, 27.[22]

The EEOC calls applicant materials and interview notes "paradigmatic" hiring evidence. (Doc No. 1-1 at 10). Even if that was true, that characterization does not explain why the Government needs records for *every* formal or informal applicant across the entire University *since 2018*, nor does it show that any potential value justifies the substantial burden of collection. *See EEOC v. Royal Caribbean Cruises, Ltd.*, 771 F.3d 757, 762-63 (11th Cir. 2014) (affirming denial of enforcement where records concerning thousands of former employees and unsuccessful applicants were "at best tangentially relevant" and collection imposed substantial burden); *United*

[22] Requests 10-11 impose a similar but separate burden by demanding every informal complaint by faculty and faculty applicants since 2018. Locating and identifying every informal complaint would require inquiries well beyond maintained complaint files. *See EEOC v. Morgan Stanley & Co.*, 132 F. Supp. 2d 146, 161-62 (S.D.N.Y. 2000) (declining to enforce a demand for all informal complaints because the burden of that inquiry "far outweighs any value that a record of such 'informal' griping might have for the EEOC's investigation").

*Air Lines*, 287 F.3d at 653-55 (reversing enforcement as issued after weighing requested information's relevance against the burden of producing it); *Ford Motor Credit*, 26 F.3d at 47-48 (recognizing substantial burden of producing employment records for all employees over a 12.5-year period and limiting enforcement).

But more fundamentally, a university such as Harvard is far from a "paradigmatic" employer. At a university, the faculty are all collectively involved in hiring their colleagues. *See* Zipser Decl. ¶ 6; Claypoole Decl. ¶¶ 9, 16. Harvard is also a particularly decentralized university. Hiring, promotion, and tenure procedures vary across each of its schools and then further within departments. *See* Zipser Decl. ¶¶ 4-5, 13-14; Claypoole Decl. ¶¶ 3-4. In a larger department or school, such as FAS or HLS, there might be dozens or more faculty who contribute to a single hiring decision. *See* Zipser Decl. ¶ 6; Claypoole Decl. ¶ 5.

These communications among faculty about the quality of the scholarship of both candidates and colleagues go to the very core of a university's academic freedom. *See* Zipser Decl. ¶ 19; Claypoole Decl. ¶ 22. These are highly confidential communications, sometimes critical, about the intellectual rigor of another academic's scholarship. Professors make these communications in confidence that they will remain confidential. *See* Zipser Decl. ¶¶ 16-17; Claypoole Decl. ¶¶ 23-24. Without that confidentiality, scholars would no longer provide candid assessments, compromising Harvard's ability to uphold its rigorous hiring standards. *See* Zipser Decl. ¶ 17.

The EEOC is demanding that Harvard collect all of those documents for every one of its faculty positions going back eight years and turn them over to the Government. The same

Government that apparently disclosed the Charge despite Title VII's confidentiality mandate;[23] whose President has called Harvard's faculty "woke," "leftist dopes," and "idiots and birdbrains;"[24] and that unlawfully sought to cut off not only $2.2 billion in Harvard research funding, but also more than $6 billion in research funding for Massachusetts hospitals that are merely affiliated with Harvard, asking, "Wouldn't that be cool?"[25]

Courts scrutinize Government attempts to pry into these sorts of communications that cut to the very core of academic freedom. *See*, *e.g.*, *Villanueva*, 930 F.2d at 129 (explaining courts' "hesitan[ce]" to question academic faculty hiring because it may "intrude upon academic freedom"). That scrutiny is especially warranted here. *This* Government's conduct towards Harvard gives the Court no basis to trust that the EEOC will handle these highly sensitive communications with any integrity.

The EEOC nonetheless argues that Harvard has not shown how compliance would disrupt its normal operations, pointing to Harvard's financial resources. (Doc No. 1-1 at 15). Financial resources cannot remedy the violation of academic freedom. The undue burden of compliance here is not merely financial—it is a burden on the core of the academic process in evaluating, hiring, promoting, and tenuring faculty.

Even by the metrics for a more typical employer, Harvard would face an undue burden if ordered to comply. FAS alone searched for approximately 1,389 faculty positions and received approximately 40,949 faculty applications since January 1, 2018, excluding "informal" applicants.

---

[23] The apparent disclosure of the Charge casts doubt on whether the EEOC will honor Title VII's separate protection for investigative information. *See* 42 U.S.C. § 2000e-8(e).

[24] @realDonaldTrump, Truth Social (Apr. 16, 2025, 7:05 AM ET), https://tinyurl.com/yww6nfw7.

[25] Michael C. Bender, Alan Blinder & Jonathan Swan, *Inside Trump's Pressure Campaign on Universities*, N.Y. Times (Apr. 14, 2025), https://perma.cc/LQ7M-MKKF.

Zipser Decl. ¶ 26. Merely identifying individuals who may possess responsive records would require hundreds of hours. *Id.* ¶ 21. Compliance would require approximately 1,015 FAS faculty and staff to spend thousands of hours locating records across 82 units. *Id.* ¶¶ 25-26. FAS faculty time alone would cost an estimated $1.2 million. *Id.* ¶ 26. That estimate excludes FAS staff time and the costs of compliance across Harvard's 12 other schools. This work falls outside those faculty and staff members' ordinary duties and would delay work critical to the school's operations. So, in addition to the burdens to Harvard's academic freedom, compliance here would unduly burden, disrupt, and seriously hinder Harvard's normal operations.

## IV. The Subpoena's Demands Are Too Indefinite to Enforce.

An administrative subpoena must also "adequately describe[]" the information sought. *Comley*, 890 F.2d at 541. Demands cannot be enforced if they are "too indefinite." *McLane*, 581 U.S. at 77 (citation omitted). A demand is too indefinite where its requests are "unduly vague." *Morgan Stanley*, 132 F. Supp. 2d at 161-62.

The subpoena's demands are so vague that they are virtually boundless in scope. For example, Request 4 seeks "any hiring committee guidance in place" since 2018. It does not say whether "guidance" includes informal advice, instructions for individual searches, or only policies issued to committees. Requests 7 to 11 turn on a definition of "applicant" that includes anyone who "expressed interest in," was "considered" for, or was "evaluated for" a posted or unposted position, formally or informally. The subpoena gives no criteria for deciding when an expression of interest or informal consideration makes someone an "applicant." Its definition could include someone who simply told a Harvard faculty member they would like to teach at Harvard one day, or a friend whom a Harvard faculty member casually described to a colleague as someone who would make a great Harvard professor. In some instances, compliance "would not be possible" because the universe of such individuals is not known or tracked. Claypoole Decl. ¶¶ 21, 28.

Request 8 compounds the uncertainty by extending "interview notes" to observations from an "intake conversation" or "discussion" with a candidate. That definition "does not comport with how faculty hiring works" at certain schools, like HLS, which does not conduct formal interviews for most faculty positions. Claypoole Decl. ¶ 26. Requests 10 and 11 seek "informal" complaints, charges, and grievances without defining what counts as a complaint or to whom it must have been made. With such a vague and broad definition, FAS's Dean for Academic Affairs knows of no means to identify such "informal" complaints. Zipser Decl. ¶ 29. Request 12 seeks each school's most knowledgeable individuals about "faculty diversification efforts," without defining those efforts or identifying any policy or program. These indefinite terms provide no workable criteria for Harvard to determine the reach of the EEOC's demands. *See Morgan Stanley*, 132 F. Supp. 2d at 161-62 (denying enforcement of request for informal complaints as "unduly vague" because compliance would "require a massive and unduly burdensome effort").

This vagueness is made worse by the EEOC's refusal to even discuss the requests with Harvard in the meet and confer process. Harvard offered hundreds of hours of its attorneys' time to meet and confer with the EEOC. Wozniak Decl. ¶¶ 33, 49. Since the parties last conferred in December 2025, the EEOC has repeatedly ignored those offers. *Id.* ¶¶ 23, 33, 49. Harvard should not have to decide at its own peril which records fall within the requests. The Court should deny enforcement of the subpoena entirely.

## CONCLUSION

For these reasons, the Court should deny the EEOC's application to enforce the subpoena. If the Court does not deny the application based upon the current record alone, it should grant Harvard's accompanying motion for leave to conduct limited discovery before the Court decides whether to grant or deny the EEOC's application to enforce the subpoena.

Dated: November 6, 2026

Respectfully submitted,

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky (BBO # 655908)
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lehotskycohn.com

Erin B. Edwards*
LEHOTSKY COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
erin@lehotskycohn.com

Eric Dreiband*
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
T: (202) 879-3939
esdreiband@jonesday.com

Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
T: (202) 737-0500
rhur@kslaw.com

Amanda A. Sonneborn*
Peter J. Wozniak*
Andrew R. Cockroft*
KING & SPALDING LLP
110 N Wacker Drive, Suite 3800
Chicago, IL 60606
T: (312) 995-6333
asonneborn@kslaw.com
pwozniak@kslaw.com
acockroft@kslaw.com

Gina Merrill*
KING & SPALDING LLP
1290 6th Ave., 14th floor
New York, NY 10104
T: (212) 556-2100
gmerrill@kslaw.com

* *Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

Counsel for Respondent certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Respondent hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ *Steven P. Lehotsky*
Steven P. Lehotsky