**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br>*Applicant*,<br>v.<br>HARVARD UNIVERSITY,<br>*Respondent*. | Case No. 1:26-mc-91522-AK |

**HARVARD'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR LEAVE TO CONDUCT LIMITED DISCOVERY AND FOR AN EVIDENTIARY HEARING**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ..... 1

A. The Government Demands Control Over Harvard's Academic Decisions. ..... 1

B. The Government Retaliates After Harvard Rejects Its Demands. ..... 3

C. The Charge is Issued as Part of the Government's Continued Retaliation. ..... 4

D. The EEOC Escalates After Harvard Prevails in the Funding Litigation. ..... 7

E. The EEOC Issues the Subpoena After Harvard Moves to Dismiss the Admissions Suit. ..... 8

ARGUMENT ..... 10

I. Harvard Has Supplied Meaningful Evidence of Improper Purpose. ..... 10

II. Targeted Discovery Will Resolve Any Remaining Questions of Improper Purpose. ..... 13

CONCLUSION ..... 15

LOCAL RULE 7.1 AND 37.1 CERTIFICATION ..... 17

CERTIFICATE OF SERVICE ..... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*EEOC v. Associated Dry Goods Corp.*,
449 U.S. 590 (1981)....................12

*EEOC v. Bashas', Inc.*,
2009 WL 3241763 (D. Ariz. Sept. 30, 2009)....................11, 13, 14, 15

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*,
798 F. Supp. 3d 77 (D. Mass. 2025)....................7, 11

*SEC v. Wheeling-Pittsburgh Steel Corp.*,
648 F.2d 118 (3d Cir. 1981)....................10, 13, 14

*United States v. Clarke*,
573 U.S. 248 (2014)....................1, 10, 11, 13, 15

*United States v. Comley*,
890 F.2d 539 (1st Cir. 1989)....................1, 10, 13

*United States v. Powell*,
379 U.S. 48 (1964)....................10, 13

**Statutes**

42 U.S.C. § 2000e-5....................5, 12

**Other Authorities**

@realDonaldTrump, Truth Social (Apr. 15, 2025, 10:09 AM ET),
https://tinyurl.com/4u7dmjdc....................3

@realDonaldTrump, Truth Social (Apr. 16, 2025, 7:05 AM ET),
https://tinyurl.com/yww6nfw7....................3, 4

@realDonaldTrump, Truth Social (Apr. 24, 2025, 9:33 AM ET),
https://tinyurl.com/y84mntt2....................4

Aaron Sibarium, *EXCLUSIVE: Trump Administration Launches Civil Rights Probe of Harvard's Hiring Practices*, Wash. Free Beacon (May 12, 2025),
https://perma.cc/AQ7X-J558....................5

Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ.: Off. of the President (Apr. 14, 2025), https://perma.cc/L4G7-J8UB....................3

*Commission Votes: August 2026*, U.S. Equal Emp. Opportunity Comm'n,
https://perma.cc/R24X-DL6U (last visited Nov. 6, 2026)....................10

EEOC, *Commissioner Charges*, https://perma.cc/UV8G-QA4C ....................................................5

Lauren Weber, Trump Administration Takes Fight With Harvard to University's Hiring Practices, Wall St. J. (May 12, 2025) ..................................................................5

President Donald Trump Taking Questions in the Oval Office (Newsmax, aired May 28, 2025, 12:42 PM ET), https://perma.cc/ZUC6-3SP6.............................................6, 12

Press Release, EEOC, EEOC Acting Chair Andrea Lucas Corrects EEOC's Course in Federal Sector, Promises Accountability and Reform (May 22, 2025), https://perma.cc/WH53-BY6S.........................................................................6

Statement of Andrea R. Lucas Before the Senate Committee on Health, Education, Labor, and Pensions (June 18, 2025), https://perma.cc/QX54-M44P..........................................................................................................................7

## INTRODUCTION

In its contemporaneous opposition to the EEOC's application to enforce its subpoena, Harvard has supplied "firm evidence" of the improper purpose underlying the EEOC's investigation—retaliation against Harvard for the exercise of its First Amendment rights. (Doc No. 26);[1] *United States v. Comley*, 890 F.2d 539, 542 (1st Cir. 1989). The Court should deny the EEOC's application for enforcement based upon that record alone.

If the Court instead determines that questions of improper purpose are unresolved, it should permit limited discovery, supplemental briefing, and, if necessary, an evidentiary hearing before deciding whether to enforce the EEOC's subpoena. Harvard has identified "specific facts or circumstances plausibly raising an inference of bad faith," *United States v. Clarke*, 573 U.S. 248, 254 (2014), connecting this investigation to the Government's campaign to retaliate against Harvard and control its academic decisions. That meaningful evidence, including an illegal leak of the Charge and subsequent publication in *The Washington Free Beacon*, warrants a targeted inquiry into the Government's purpose through limited discovery before the Court decides whether to order enforcement.

## BACKGROUND

### A. The Government Demands Control Over Harvard's Academic Decisions.

Harvard is the oldest institution of higher education in the United States and one of the world's leading research universities. Harvard employs more than 20,000 faculty and staff across its central administration, Harvard College, 12 graduate and professional schools, and the Harvard Radcliffe Institute. Declaration of Nina Zipser dated November 6, 2026 ("Zipser Decl.") ¶ 2.

---

[1] Harvard relies on the declarations and accompanying exhibits filed in support of its opposition to the EEOC's application and response to the Order to Show Cause (Doc Nos. 27-30).

The Government has made clear that it wants Harvard to change the composition of its faculty, along with its hiring and promotion practices. On April 3, 2025, the Government sent Harvard a list of "pre-conditions" it "must comply with" to continue receiving federal funds. Declaration of Steven P. Lehotsky dated November 6, 2026 ("Lehotsky Decl.") Ex. 1 at 1. The letter identified changes to academic programs and departments to "improve viewpoint diversity" and "end ideological capture" as two of those conditions. *Id.* at 2-3. The Government sent Harvard a "menu" of proposals that same day, including "[n]ew hires (including tenure track) to promote viewpoint diversity and free exchange of ideas," "cluster hiring across the University," new "criteria for faculty hiring and tenure, with emphasis on intellectual diversity," and "[e]nd[ing] prioritization of 'activists' and DEI criteria." Lehotsky Decl. Ex. 2 at 4-6.

The Government expanded those demands on Friday, April 11, 2025, requiring access to hiring data for audits and direct oversight of faculty composition as a precondition for Harvard to maintain an ongoing research relationship with the federal Government. It directed Harvard to commission an outside party—one that must be acceptable to the Government—to audit Harvard's faculty, staff, and leadership "for viewpoint diversity, such that each department, field, or teaching unit must be individually viewpoint diverse." Lehotsky Decl. Ex. 3 at 2. Any department or field "found to lack viewpoint diversity must be reformed by hiring a critical mass of new faculty … who will provide viewpoint diversity." *Id.* at 3. "All hiring and related data" must be shared with the Government for "a comprehensive audit." *Id.* at 2. Harvard also had to "reduc[e] the power held by faculty (whether tenured or untenured) and administrators more committed to activism than scholarship" and "empower[] … exclusively those most devoted" to implementing the Government's demands. *Id.* at 1. The Government demanded annual viewpoint audits and

corrective measures, with continuing federal oversight of these reforms through at least the end of 2028. *Id.* at 5.

**B. The Government Retaliates After Harvard Rejects Its Demands.**

Harvard rejected the Government's demands on Monday, April 14, 2025. Harvard explained that the Government's demands were "in contravention of the First Amendment" and "invade[d] university freedoms long recognized by the Supreme Court." Lehotsky Decl. Ex. 4 at 1-2. Harvard refused to "surrender its independence or relinquish its constitutional rights" or "allow itself to be taken over by the federal government." *Id.* at 2. Harvard said that it remained open to further dialogue, but that it would not agree "to demands that go beyond the lawful authority of this or any administration." *Id.* Harvard further explained publicly that the Government's demands "represent[ed] direct governmental regulation of the 'intellectual conditions' at Harvard."[2] "No government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue."[3]

Within hours of Harvard's letter and statement, the Government announced a freeze on funding for grants and contracts with total value of more than $2.2 billion. Lehotsky Decl. Ex. 5. The next day, the President attacked Harvard's "ideological … '[s]ickness'" and threatened to revoke Harvard's tax-exempt status.[4] Shortly thereafter, the President accused Harvard of "hiring almost all woke, Radical Left, idiots and 'birdbrains.'"[5] He continued by stating "[m]any others,

[2] Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ.: Off. of the President (Apr. 14, 2025), https://perma.cc/L4G7-J8UB.

[3] *Id.*

[4] @realDonaldTrump, Truth Social (Apr. 15, 2025, 10:09 AM ET), https://tinyurl.com/4u7dmjdc.

[5] @realDonaldTrump, Truth Social (Apr. 16, 2025, 7:05 AM ET), https://tinyurl.com/yww6nfw7.

like these Leftist dopes, are teaching at Harvard, and because of that Harvard can no longer be considered even a decent place of learning."[6] On April 21, 2025, Harvard sued to challenge the funding freeze. *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-11048 (D. Mass. Apr. 21, 2025) (the "Funding Litigation"). Over the ensuing months, the Government expanded its retaliatory campaign—trying multiple times to bar Harvard from enrolling international students and launching investigations into its finances, admissions practices, and even patent licensing. Several of these disputes are also being litigated in this District or the First Circuit.[7]

**C. The Charge is Issued as Part of the Government's Continued Retaliation.**

On April 25, 2025, only four days after Harvard filed suit and the very day after the President again attacked Harvard as a "Far Left Institution" and a "Liberal mess," accusing it of "allowing a certain group of crazed lunatics to enter and exit the classroom" to teach,[8] EEOC Acting Chair Andrea Lucas issued the Commissioner's Charge underlying this proceeding. (Doc No. 1-3). The Charge alleges Harvard engaged in a pattern and practice of discrimination against white, Asian, male, or straight employees, applicants, and training-program participants, dating back to 2018, and based solely on the overall demographic composition of Harvard's faculty. It does not purport to investigate *any* individual claims of discrimination; rather, it initiates an

---

[6] *Id.*

[7] The parties have litigated four other matters in this District or the First Circuit. *See United States v. President & Fellows of Harvard Coll.*, No. 26-cv-10844-MJJ (D. Mass.) (recently dismissed Government suit seeking admissions records); *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-2230 (1st Cir.) (Government's appeal of permanent injunction barring retaliatory funding cuts); *President & Fellows of Harvard Coll. v. DHS*, No. 25-1627 (1st Cir.) (Government's appeal of preliminary injunction blocking the proclamation restricting entry by international students); *United States v. President & Fellows of Harvard Coll.*, No. 26-1978 (1st Cir.) (Government's appeal of the dismissal of its Title VI antisemitism suit).

[8] @realDonaldTrump, Truth Social (Apr. 24, 2025, 9:33 AM ET), https://tinyurl.com/y84mntt2.

expansive and burdensome investigation of every single employment decision at each of Harvard's schools spanning eight years on the absurd theory that Harvard was intentionally discriminating against every person who is not simultaneously a woman or non-binary and also non-heterosexual, Black, and Native American.

The Charge's circumstances are indeed highly irregular. To start, it is a Commissioner's Charge—a category which accounts for "far less than 1%" of the EEOC's annual charge volume.[9] Notwithstanding the existence of an EEOC office in Boston, the Acting Chair assigned the Charge to be investigated by its Houston Office, even though there is no connection to Texas. Declaration of Peter J. Wozniak dated November 6, 2026 ("Wozniak Decl.") Ex. 1. Further, although Title VII makes it a crime for the EEOC or any of its officers or employees to make a charge public without the consent of the employer, 42 U.S.C. § 2000e-5(b), a copy nonetheless appeared in *The Washington Free Beacon* just a few weeks after the Charge's issuance and in the midst of the Government's termination of all of Harvard's research grants and contracts.[10] Harvard never released nor consented to the release of the Charge, and because Acting Chair Lucas filed the Charge, there is no nongovernmental party to the Charge who could have made it public. Just 10

---

[9] Commissioner Lucas brought the Charge rather than any aggrieved individual. Such "Commissioner charges" are rare. From fiscal year 2015 through fiscal year 2024, the median number of new Commissioner charges was 14.5 per year, representing "far less than 1%" of the EEOC's annual charge volume. EEOC, *Commissioner Charges*, FAQ 7, https://perma.cc/UV8G-QA4C.

[10] Aaron Sibarium, *EXCLUSIVE: Trump Administration Launches Civil Rights Probe of Harvard's Hiring Practices*, Wash. Free Beacon (May 12, 2025), https://perma.cc/AQ7X-J558. The Wall Street Journal described the investigation as "the latest escalation of the battle" between the Government and Harvard. Lauren Weber, Trump Administration Takes Fight With Harvard to University's Hiring Practices, Wall St. J. (May 12, 2025), https://perma.cc/ZE6Z-3HTT.

days after the Charge was leaked, Chair Lucas described the EEOC as "accountable to the President's authority."[11]

On May 27, 2025, Harvard responded to the Charge, challenging the investigation's retaliatory purpose and explaining Harvard's hiring practices. Harvard stated that it hires "based on merit and achievement" by "seek[ing] the best educators, researchers, and scholars," uses neither "quotas" nor "ideological litmus tests," and does not use DEI statements in hiring decisions. Wozniak Decl. Ex. 3 at 1. Harvard identified the Charge as "the latest attempt by the government to dictate educational decision-making at Harvard through pretextual and retaliatory agency actions." *Id.* at 2. Harvard also linked the Charge to the Government's use of funding cuts as "leverage to gain control over academic decision-making," emphasizing that the Government's "funding freeze and the Charge appear to have the same aim: to unlawfully punish Harvard for its protected activity in opposition to the current administration's unlawful demands." *Id.* at 4-5.

The next day, the President publicly confirmed that Harvard's exercise of its rights prompted further punishment. He stated Harvard was "hurting [itself]" by "fighting."[12] In President Trump's words, "every time [Harvard] fight[s], they lose another $250 million."[13] "All [Harvard is] doing is getting in deeper and deeper and deeper. They've got to behave themselves."[14] In Chair Lucas's statement for her confirmation hearing, held about one month after the Charge was leaked, she boasted that she was "passionate about achieving" the President's

---

[11] Press Release, EEOC, EEOC Acting Chair Andrea Lucas Corrects EEOC's Course in Federal Sector, Promises Accountability and Reform (May 22, 2025), https://perma.cc/WH53-BY6S.

[12] President Donald Trump Taking Questions in the Oval Office at 6:01 (Newsmax, aired May 28, 2025, 12:42 PM ET), https://perma.cc/ZUC6-3SP6.

[13] *Id.* at 0:54.

[14] *Id.* at 5:10.

agenda.[15] On August 1, 2025, the EEOC sent Harvard its first requests for information, which included 33 individual requests with 84 subparts. Wozniak Decl. ¶ 7.

**D. The EEOC Escalates After Harvard Prevails in the Funding Litigation.**

On September 3, 2025, the District Court granted summary judgment to Harvard on its First Amendment and Title VI claims, as well as injunctive relief against further governmental retaliation in violation of the First Amendment. *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 117-33, 135-36 (D. Mass. 2025). The court concluded that the Government's April 2025 demands sought to "overhaul [Harvard's] governance, hiring, and academic programs to comport with the government's ideology and prescribed viewpoint." *Id.* at 119. The court recognized that the First Amendment protects Harvard's "autonomous decisionmaking," including its "prerogative 'to determine for itself on academic grounds who may teach,' and what is taught in the 'college classroom.'" *Id.* at 118-19 (citations omitted). It found that the April 11 demands targeted "these core freedoms," while Harvard's refusal "was aimed at preserving them." *Id.* at 119.

The very next day, the EEOC demanded on-site interviews with 10 senior Harvard officials, including the University's President and Provost, during Rosh Hashanah (the week of September 22). Wozniak Decl. Ex. 7 at 1. The day after that, before Harvard's agreed response deadline had lapsed, the EEOC emailed Harvard's counsel threatening a September 9 subpoena unless Harvard supplied a "full and complete response" to the August 1 information requests by September 8. Wozniak Decl. Ex. 8 at 1.

---

[15] Statement of Andrea R. Lucas Before the Senate Committee on Health, Education, Labor, and Pensions at 2 (June 18, 2025), https://perma.cc/QX54-M44P.

Harvard did so. It provided 3,491 pages of responsive information, including 67 Excel spreadsheets of data. Wozniak Decl. ¶ 10. Harvard also provided written responses and objections to the August 1 requests and offered to confer in an effort to come to an agreement on the scope of the requests. *Id.*

The following day, the EEOC served 97 *additional* requests with 248 subparts, principally concerning the student programs identified in the Charge. *Id.* ¶ 11. Harvard again provided written responses and objections and repeatedly offered to confer about the scope of the requests. *Id.* ¶ 18.

In February 2026, the EEOC proposed limiting its initial investigation to five schools. *Id.* ¶ 26. Harvard agreed to cooperate while preserving its objections and explained that collecting records dispersed across schools and departments would require substantial manual work. *Id.* ¶¶ 29-30. The EEOC served a third set of RFIs on March 6, 2026, seeking records related to those five schools. *Id.* ¶ 27. Harvard continued producing documents and offered 295.5 hours of availability across 77 business days to confer. *Id.* ¶¶ 31, 33. The EEOC never even responded to these offers to confer. *Id.* As of June 5, 2026, Harvard had produced over 9,000 pages of documents to the EEOC in response to the EEOC's three sets of RFIs. *Id.* ¶ 35. Between March 20 and June 11, the Government did not respond whatsoever to Harvard's submissions or identify any deficiencies in them. *Id.* ¶ 34.

### E. The EEOC Issues the Subpoena After Harvard Moves to Dismiss the Admissions Suit.

On June 8, 2026, just five days after Harvard moved to dismiss the Government's admissions-records suit and without responding to Harvard's repeated offers to confer,[16] the EEOC

[16] Although the Government claims to have "engaged in many discussions with the Respondent about the scope of the investigation and the lack of the required production," (Doc No. 1-1 at 11), the parties last conferred on December 15, 2025. Wozniak Decl. ¶ 23. Even then, the EEOC did not describe Harvard's production as deficient. *Id.* ¶ 24. Between that last conferral and the

further escalated by issuing Subpoena No. HU-A26-02 (the "subpoena"). Without explanation, the EEOC abandoned its prior narrowed focus on five schools and gave Harvard just 14 days to produce hiring records across the entire University spanning more than eight years, and to produce additional records from as far back as 2005. (Doc No. 1-2); Wozniak Decl. Ex. 28 at 5-7.[17]

For the first time, the EEOC demanded records for *all* faculty applicants, regardless of whether they were hired, including every application, cover letter, resume, and curriculum vitae, together with *all* interview notes (whether electronic or handwritten) and school-specific spreadsheets identifying applicants' race and sex, hiring outcomes, and relevant employment decisionmakers. (Doc No. 1-2, Requests 7-9). The subpoena's definition of "applicant" encompasses anyone who merely expressed interest or was considered "whether formally or informally," including for any "unposted position[s]." (Doc No. 1-2 at 1). "Faculty" includes not only tenured and tenure-track professors but also visiting, adjunct, clinical, research, instructional, and postdoctoral positions. *Id.* The subpoena further demands records—some going back more than 20 years—concerning Harvard's diversity offices and initiatives, hiring guidance, diversity officials' roles and performance, discrimination complaints, including "informal" complaints, and related investigations. (Doc No. 1-2, Requests 1-6, 10-11); Wozniak Decl. Ex. 28 at 5-7.

Harvard received the subpoena on June 11, 2026, and petitioned to revoke or modify it on June 18, challenging its retaliatory purpose, intrusion into protected academic decision making, indefiniteness, and extraordinary burden. (Doc No. 1-4). The EEOC denied the petition on August

---

issuance of the subpoena, the EEOC failed to respond to Harvard's repeated offers for conferrals for approximately six months, and did not once criticize or question the rate or scope of Harvard's production. *Id.* ¶¶ 25-37.

[17] The following day, the EEOC issued a second subpoena, No. HU-A26-03, seeking further employment, compensation, demographic, and applicant data for Harvard's teaching and research positions over more than eight years. Wozniak Decl. ¶ 37. Harvard's petition to revoke or modify that subpoena remains pending before the EEOC, so it is not before this Court.

31, 2026, in a party-line 2-1 vote, with the Commission's two Trump appointees forming the majority. Wozniak Decl. Ex. 29.[18] After service of the Determination on September 9, 2026, Harvard produced nearly two thousand pages over three weeks and again offered to confer. Wozniak Decl. ¶¶ 43-46. Following its pattern of escalating without responding to offers to confer, the Government filed this enforcement proceeding on September 29, 2026.

## ARGUMENT

A court may not permit its process to be abused through enforcement of an administrative subpoena. *United States v. Powell*, 379 U.S. 48, 58 (1964). Such abuse occurs where a subpoena serves an improper purpose, including harassment or pressure to settle a collateral dispute. *Id.* A respondent is entitled to discovery into the agency's purpose so long as the respondent identifies "specific facts or circumstances plausibly raising an inference of bad faith." *Clarke*, 573 U.S. at 254. If the Court does not deny enforcement of the subpoena on the present record, *see* (Doc No. 26), it should order limited discovery and, if necessary, an evidentiary hearing to resolve any remaining questions of improper purpose before deciding whether to grant or deny the EEOC's application for enforcement.

### I. Harvard Has Supplied Meaningful Evidence of Improper Purpose.

Discovery in an administrative subpoena enforcement proceeding is permitted in "extraordinary circumstances." *Comley*, 890 F.2d at 543. The EEOC's treatment of Harvard presents those circumstances.

Courts permit discovery where a respondent presents "meaningful evidence" that the agency is abusing its investigative authority. *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d

[18] *Commission Votes: August 2026*, U.S. Equal Emp. Opportunity Comm'n, https://perma.cc/R24X-DL6U (last visited Nov. 6, 2026).

118, 128-30 (3d Cir. 1981) (en banc) (citation omitted); *see also EEOC v. Bashas', Inc.*, 2009 WL 3241763, at *14 (D. Ariz. Sept. 30, 2009) (granting limited discovery in EEOC enforcement proceeding based on a "preliminary and substantial demonstration of abuse" (citation and emphasis omitted)). "[C]ircumstantial evidence can suffice." *Clarke*, 573 U.S. at 254. Here, there is meaningful evidence based upon the specific facts and circumstances in the public record that the Government issued the subpoena to further its retaliation for Harvard's protected First Amendment activity. Accordingly, Harvard should be permitted to obtain limited discovery into the EEOC's improper purpose behind the subpoena.

The Government first demanded control over faculty hiring, academic governance, and the viewpoints represented across the University as a condition of continued federal funding. Lehotsky Decl. Ex. 1. Its April 3 "menu" proposed new hires and changes to tenure criteria to promote its preferred viewpoints. Lehotsky Decl. Ex. 2 at 4-6. Its April 11 demands required viewpoint audits, corrective faculty hiring, and access to "all hiring and related data." Lehotsky Decl. Ex. 3 at 2-3. Harvard refused to surrender its protected academic independence, and the Government immediately froze grants and contracts worth billions of dollars in federal research funding. Lehotsky Decl. Exs. 4-5. Harvard then sued to defend its constitutional rights. A court in this District upheld those rights, holding that the Government's demands targeted Harvard's "core freedoms." *President & Fellows of Harvard Coll.*, 798 F. Supp. 3d at 119. It also recognized Harvard's lawsuit as "quintessential First Amendment protected conduct." *Id.* at 118 n.20. The President expressly and repeatedly threatened further punishment for that protected resistance. The

President declared that "every time [Harvard] fight[s], they lose another $250 million" and warned that Harvard needed "to behave themselves."[19]

The timing and scope of the EEOC's investigation confirm its role in the Government's retaliatory campaign. Chair Lucas issued the Charge just four days after Harvard challenged the funding freeze. (Doc No. 1-3). The day after Harvard secured summary judgment and an injunction against further retaliation, the Government demanded interviews with 10 senior Harvard officials. Wozniak Decl. ¶ 8. The following day, it threatened a subpoena. *Id.* ¶ 9. The Government later issued this subpoena five days after Harvard moved to dismiss the Government's admissions-records suit. It seeks every faculty applicant's application, cover letter, resume, and CV, together with interview notes and applicant-level data on race, sex, hiring outcomes, and decisionmakers, across the University dating back to 2018. (Doc No. 1-2 at 1, Requests 7-9). These demands seek the same comprehensive audit of Harvard's faculty hiring that the Government previously demanded in connection with the funding freeze.

The investigation's procedural irregularities further demonstrate its retaliatory purpose. The Government assigned this Massachusetts matter to the EEOC's Houston office, although the Charge identifies eight Massachusetts institutions and has no connection to Texas. Wozniak Decl. ¶¶ 2-3. The Charge also appeared in *The Washington Free Beacon* weeks after its issuance, despite Title VII's criminal prohibition on the EEOC making charges public. 42 U.S.C. § 2000e-5(b). Harvard never released the Charge nor consented to its release. Although Title VII permits disclosure to parties to the agency proceeding, that exception does not extend to the public generally. *See EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 598, 603 (1981). Here, the

[19] President Donald Trump Taking Questions in the Oval Office at 0:54, 5:10 (Newsmax, aired May 28, 2025, 12:42 PM ET), https://perma.cc/ZUC6-3SP6.

Charge was filed by the Commissioner, not a private charging party, and identifies no allegedly aggrieved individual. (Doc No. 1-3). These circumstances suggest that someone within the EEOC supplied the Charge to the press, directly or through an intermediary.

The Court should deny enforcement on the existing record. (Doc No. 26). At a minimum, however, Harvard has identified "specific facts [and] circumstances plausibly raising an inference of bad faith," *Clarke*, 573 U.S. at 254, warranting limited discovery. The Government initiated and repeatedly escalated this investigation when Harvard sought or obtained judicial relief against the Government. *See Bashas'*, 2009 WL 3241763, at *12-14 (granting limited discovery based on investigative timing and evidence linking the investigation to collateral litigation). The subpoena is extremely broad and expressly seeks some of the same faculty hiring data the Government demanded as part of its efforts to control Harvard's faculty affairs. (Doc No. 1-2 at 1, Requests 7-9); Lehotsky Decl. Ex. 3 at 2-3. That overlap warrants inquiry into whether the EEOC used its investigative authority to advance those demands. *See Wheeling-Pittsburgh*, 648 F.2d at 120-30 (authorizing discovery on remand into whether political pressure displaced agency's independent judgment). The Charge's illegal disclosure to the press likewise warrants inquiry into the source of that disclosure and whether the EEOC authorized or facilitated its release in order to harass Harvard or pressure it to yield in the parties' collateral disputes. *See Powell*, 379 U.S. at 58. Together, these facts establish extraordinary circumstances warranting limited discovery into the Government's purpose behind this investigation. *See Comley*, 890 F.2d at 543.

## II. Targeted Discovery Will Resolve Any Remaining Questions of Improper Purpose.

Harvard seeks documents, written discovery, and depositions from the EEOC and, as appropriate, third parties, addressing the specific evidence discussed above, followed by supplemental briefing and, if necessary, an evidentiary hearing. This procedure would allow the

Court to resolve any questions of improper purpose before deciding whether to enforce the subpoena. *See Wheeling-Pittsburgh*, 648 F.2d at 129-30; *Bashas'*, 2009 WL 3241763, at *16-17.

Harvard seeks leave to conduct limited discovery on the following topics:

1. The decisions to initiate and escalate the investigation and determine the scope of the investigation, the requests for information, and the subpoena. This topic includes communications concerning the investigation's timing, scope, and conduct, including its relationship to Harvard's protected conduct, the parties' litigation, and the Government's demands concerning faculty hiring and academic governance. It encompasses communications with the EEOC and with other governmental officials or outside parties concerning whether Harvard's protected conduct, the parties' litigation, or the Government's demands concerning faculty hiring and academic governance influenced decisions about the investigation's initiation, timing, scope, or conduct. These materials would show whether the Government used the investigation to retaliate against Harvard for exercising its First Amendment rights.

2. The decision to assign the investigation to the EEOC's Houston office. Harvard seeks documents identifying who directed that assignment and why. Those materials would show whether the assignment served the retaliatory campaign described above, including through the selection and direction of officials responsible for the investigation.

3. The source, authorization, and purpose of the Charge's disclosure to the press. Harvard seeks documents and communications showing whether governmental officials made, authorized, or facilitated disclosure to *The Washington Free Beacon* and for what purpose. This topic includes whether the EEOC or its Office of Inspector General initiated or assisted with any internal investigation to identify the source of disclosure. Those materials would show whether the

Government leaked the Charge in order to harass Harvard or pressure it to yield in collateral disputes.

Harvard proposes six months to complete targeted document production, written discovery, and depositions from the EEOC and, as appropriate, third parties, confined to the subjects, decisions, and events identified herein. *Cf. Bashas'*, 2009 WL 3241763, at *16-17. That period would allow time to complete discovery and resolve any potential discovery disputes. After production, the Court should receive supplemental briefing and, if necessary, hold an evidentiary hearing at which Harvard may examine witnesses with knowledge of those matters. *See Clarke*, 573 U.S. at 254-55. The Court should defer its decision on enforcement, and any obligation to comply with the subpoena, until this process concludes.

## CONCLUSION

For these reasons, if the Court does not deny the EEOC's application for enforcement on the existing record, it should grant Harvard's motion for limited discovery followed by supplemental briefing and, if necessary, an evidentiary hearing. The Court should set the proposed schedule and permit supplemental briefing in support of Harvard's request to deny enforcement. It should defer its enforcement decision and any obligation to comply with the subpoena until that process concludes.

Dated: November 6, 2026

Respectfully submitted,

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky (BBO # 655908)
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lehotskycohn.com

Erin B. Edwards*
LEHOTSKY COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
erin@lehotskycohn.com

Eric Dreiband*
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
T: (202) 879-3939
esdreiband@jonesday.com

Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
T: (202) 737-0500
rhur@kslaw.com

Amanda A. Sonneborn*
Peter J. Wozniak*
Andrew R. Cockroft*
KING & SPALDING LLP
110 N Wacker Drive, Suite 3800
Chicago, IL 60606
T: (312) 995-6333
asonneborn@kslaw.com
pwozniak@kslaw.com
acockroft@kslaw.com

Gina Merrill*
KING & SPALDING LLP
1290 6th Ave., 14th floor
New York, NY 10104
T: (212) 556-2100
gmerrill@kslaw.com

** Admitted Pro Hac Vice*

**LOCAL RULE 7.1 AND 37.1 CERTIFICATION**

Pursuant to Local Rules 7.1(a)(2) and 37.1(a), counsel for Respondent conferred with counsel for Applicant and attempted in good faith to resolve or narrow the issues raised by this motion. Counsel for Applicant opposes the relief requested.

/s/ *Steven P. Lehotsky*
Steven P. Lehotsky

**CERTIFICATE OF SERVICE**

Counsel for Respondent certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Respondent hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ *Steven P. Lehotsky*
Steven P. Lehotsky